Chief Judge Brbitel.
Eight defendants, convicted of drug offenses, in separate appeals challenge the constitutionality of statutes classifying the crimes for which they were convicted as class A felonies, the highest rank of crime in this State (Penal Law, §§ 220.40, 220.39, 220.18). They also challenge the applicable sentencing provisions imposing a mandatory maximum sentence of life imprisonment and mínimums from one or six years to eight and one-third years (Penal Law, § 70.00, subd 2, par [a]; subd 3, par [a], els [ii], [iii]; for a compilation and analysis of the drug statutes see, generally, Rosenblatt, New York’s New Drug Laws and Sentencing Statutes). In each case, the Appellate Division sustained the statutes as constitutional.
Six defendants were convicted of one or two felonious "street” sales of heroin or cocaine. Two, however, were convicted of more serious offenses, sale of one-eighth ounce or more of cocaine, and possession of one ounce or more of heroin.
The principal issue is whether the so-called "drug” laws, in mandating life imprisonment and, therefore, lifetime parole on parole release, prescribe sentences so disproportionate as would constitute cruel and unusual punishment in violation of constitutional limitations (NY Const, art I, § 5; US Const, 8th Arndt). Of course, defendants in these cases are not being punished for their status as addicts but for the offenses they have committed, however impelled by their "drug dependency”, if that were the cause of their criminal acts (cf. Robinson v California, 370 US 660, 667; People v Davis, 33 NY2d 221,226, cert den 416 US 973). In a deterministic sense, all criminals commit the crimes they do because they "must”.
There should be an affirmance. The sentences are not grossly disproportionate in constitutional analysis. The Legislature may distinguish among the ills of society which require a criminal sanction, and prescribe, as it reasonably views them, punishments appropriate to each. Thus, while the courts possess the power to strike down punishments as violative of constitutional limitations, the power must be exercised with especial restraint. However disproportionality *111 is measured, the instant sentences do not rise to the gross disproportionality violative of constitutional limitations. The constitutional equal protection (NY Const, art I, § 11; US Const, 14th Arndt) arguments of appellants are not separately discussed because the same reasoning which supports the concededly and intendedly severe sentences, especially with regard to deterrence, would sustain, if valid, a reasonable classification between defendants in drug cases and in other cases.
The cruel and unusual punishments clause is a flexible one with a long historical development (see Appendix attached to this opinion). Although the intent of the framers was to proscribe barbaric, torturous punishments, the clause has come to mean much more. Prohibited also are punishments grossly disproportionate to the crime. In considering punishments the máximums must be examined, whether they be for long or lifetime imprisonment or for long or lifetime parole (see Matter of Lynch, 8 Cal 3d 410, 419).
No punishment in this State has ever been struck down as unconstitutionally disproportionate to its crime. Courts of this State have nevertheless recognized the principle of gross disproportionality (see People v Davis, 33 NY2d 221, 226, supra; Matter of Bayard, 25 Hun 546, 549). Elsewhere, even in the United States Supreme Court, this principle has been considered applicable, and, in some instances, has been used to overturn statutory punishments (see Weems v United States, 217 US 349; Hart v Coiner, 483 F2d 136, cert den 415 US 983; Ralph v Warden, 438 F2d 786, cert den 408 US 942; Matter of Foss, 10 Cal 3d 910; Matter of Lynch, 8 Cal 3d 410, 423, n 13, supra, and cases cited; People v Lorentzen, 387 Mich 167). Given the flexibility of the cruel and unusual punishment clause, and the persuasive, if not circular, logic of the assertion that grossly disproportionate punishments are “cruel and unusual”, the applicability of the principle is here accepted.
Apart from a subjective evaluation which looks to the extent to which the conscience of the court is shocked by punishments imposed, there have developed standards to determine whether punishments are constitutionally disproportionate. Because such a subjective test has obvious weaknesses in trying to apply a rational analysis, although often used by such of the courts which have applied or discussed the cruel and unusual punishments clause, there will be no discussion *112 of it (see, e.g., Wilkinson v Skinner, 34 NY2d 53, 59-60; Matter of Lynch, 8 Cal 3d 410, 424, supra; but cf., e.g., Matter of Pell v Board of Educ. of Union Free School Dist No. 1 of Towns of Scarsdale & Mamaroneck, 34 NY2d 222, 233-235; Rochin v California, 342 US 165, 175-176 [Black, J., concurring]).
The gravity of the offense is obviously key, as is the gravity of the danger which the offender poses to society. Given grave offenses committed or committable by dangerous offenders, the penological purposes of the sentencing statutes, whether they be the rehabilitation or isolation of offenders or the deterrence of potential offenders, will be decisive (see Weems v United States, 217 US 349, 365, supra; O’Neil v Vermont, 144 US 323, 337-341 [dissenting opn]; Hart v Coiner, 483 F2d 136, 141, cert den 415 US 983, supra; Matter of Foss, 10 Cal 3d 910, 919-920, supra; Matter of Lynch, 8 Cal 3d 410, 425, supra; Faulkner v State, 445 P2d 815, 818-819 [Alaska]).
In considering these factors, it will be useful, and will follow precedential doctrine, to compare the challenged punishments with those prescribed in the same jurisdiction for other offenses and also with punishments for the same or similar offenses prescribed in other jurisdictions (see, e.g., Weems v United States, 217 US 349, 377, 380-381, supra; Hart v Coiner, 483 F2d 136, 141-142, cert den 415 US 983, supra; Ralph v Warden, 438 F2d 786, 791-792, cert den 408 US 942, supra; Matter of Lynch, 8 Cal 3d 410, 426-428, supra; People v Lorentzen, 387 Mich 167, 177-179, supra).
In assessing the gravity of a criminal offense, the primary consideration is the harm it causes to society. The Legislature, in making this assessment, could properly view criminal narcotics sales not as a series of isolated transactions, but as symptoms of the widespread and pernicious phenomenon of drug distribution. Social harm in drug distribution is great indeed. The drug seller, at every level of distribution, is at the root of the pervasive cycle of destructive drug abuse (see, generally, President’s Comm, on Law Enforcement and the Administration of Justice, Task Force on Narcotics and Drug Abuse [1967], p 7).
Defendants would minimize drug trafficking by arguing that it is not a crime of violence. Because of their illegal occupation, however, drug traffickers do often commit crimes of violence against law enforcement officers and, because of the high stakes, engage in crimes of violence among themselves *113 (see, e.g., People v Medina, 47 AD2d 717 [two drug pushers, upon learning of a dealer’s plot to have one kill the other, kill the dealer]).
More significant, of course, are the crimes which drug traffickers engender in others. The seller often introduces the future addict to narcotics. The addict, to meet the seller’s price, often turns to crime to "feed” his habit. Narcotics addicts not only account for a sizable percentage of crimes against property; ‘they commit a significant number of crimes of violence as well (see Task Force on Narcotics and Drug Abuse, op. cit, pp 10-11; Second Report of the National Comm, on Marijuana and Drug Abuse, Drug Use in America: Problem in Perspective, p 165; see, generally, Greenberg and Adler, Crime and Addiction: An Empirical Analysis of the Literature, 1920-1973, 3 Contemporary Drug Problems 221).
Thus the Legislature could reasonably have found that drug trafficking is a generator of collateral crime, even violent crime. And violent crime is not, of course, the only destroyer of men and the social fabric. Drug addiction degrades and impoverishes those whom it enslaves. This debilitation of men, as well as the disruption of their families, the Legislature could also lay at the door of the drug traffickers (see, generally, Interim Report of the Temporary State Comm, to Evaluate the Drug Laws, NY Legis Doc, 1972, No. 10, p 58).
Measured thus by the harm it inflicts upon the addict, and, through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank.
A second consideration, in assessing the proportionality of the punishment to the crime, is the character of the offender and the gravity of the threat he poses to society. None of the present cases involve what are often called "accidental” offenders. True, not all of these defendants are "hardened” criminals. In each case, however, defendant was convicted of at least "street” sales of heroin or cocaine, or possession of a large amount of narcotics, two of the situations to which the statutes were directed.
The legislative presumption that he who possesses a large amount of narcotics is a seller would also seem reasonable. Defendant McNair, who was arrested in premises that were a veritable heroin "factory” with over an ounce of the drug in her constructive possession, is hardly less culpable or dangerous than the appellants who made "street” sales.
*114 These eight defendants were actually or presumptively, then, at least narcotics sellers, not only under broad statutory definition, but in the narrower, literal sense as well. As sellers, they cannot disclaim their roles in the scourge of drug distribution. The Legislature might reasonably deem the threat posed to society by each of these defendants a grave one indeed.
The penological purposes, conceived by the Legislature as justifying the elimination of discretionary, individualized sentencing in favor of inflexible maximum lifetime sentences, are additional factors to be considered in measuring disproportionality.
Defendants argue that the new sanctions neither favor, nor presume much likelihood of, their future rehabilitation. True, the elimination of discretionary sentencing, and the substitution of inflexible maximum sentences have been often tried and as often abandoned as "remedies”. Equally true, there is considerable highly-respected authority which questions the wisdom of eliminating flexible sentencing standards in drug cases in favor of long, mandatory prison terms (see, e.g., Task Force on Narcotics and Drug Abuse, op. cit., pp 11-12; cf. Furman v Georgia, 408 US 238, 402-403 [Burger, C. J., dissenting]).
Rehabilitation, however, is only one of the recognized purposes of penal sanctions (see People v Oliver, 1 NY2d 152, 160). At the same time, put aside as factors are motives of retribution or stimulus to vigilantism which sometimes may avowedly or unconsciously motivate the use of criminal sanctions. Faced with what it found to be a high recidivism rate in drug-related crimes, an inadequate response to less severe punishment, and an insidiously growing drug abuse problem, the Legislature could reasonably shift the emphasis to other penological purposes, namely, isolation and deterrence.
The reasons for isolating drug traffickers have already been suggested. The Legislature could find that narcotics sellers were the crucial link in the pernicious cycle of drug abuse; that sellers spawn addiction, and that addicts, in türn, may become sellers. As a minimal proposition, the seller, in feeding the addict’s habit, frustrates rehabilitation. The Legislature could conclude that the best way to break the chain would be to remove the seller from society for a long duration, and, upon his return, to continue surveillance through lifetime parole.
*115 Deterrence is the other obvious purpose. It was thought that rehabilitation efforts had failed; that the epidemic of drug abuse could be quelled only by the threat of inflexible, and therefore certain, exceptionally severe punishment (see Annual Message of Governor Rockefeller, McKinney’s 1973 Session Laws of NY, vol 2, pp 2317-2318; see, also, People v Davis, 33 NY2d 221, 228, supra; Hechtman, Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law, art 220, p 6 [1974-1975 Pocket Part]; for a history of the drug abuse problem in New York and the legislative response see Hardt and Brooks, Social Policy on Dangerous Drugs: A Study of Changing Attitudes in New York and Overseas, 48 St John’s L Rev 48; see, generally, United States v Moore, 486 F2d 1139, 1215-1229 [Wright, J., dissenting]; Brecher and the Editors of Consumer Reports, Licit and Illicit Drugs, pp 42-59). Thus, to achieve the deterrence, so far seemingly elusive, the would-be drug trafficker had to be put on notice that, should he be caught, his fate was sealed regardless of his position in the hierarchy of distribution and regardless of the quantity of drugs in which he dealt.
The deterrence principle may not, of course, be applied absolutely. Littering or speeding, for example, would certainly be diminished by the threat of severe punishments, but they are relatively minor offenses to which penalties of the kind imposed for the drug offenses would be readily recognized as grossly disproportionate. Drug trafficking, on the other hand, is hardly, on any view, a minor offense.
Whether the sentences are grossly disproportionate is measurable by comparison with punishments imposed for other crimes within this State, as well as with punishments imposed for the same or similar crimes in other jurisdictions.
The drug offenses, concededly, are punished more severely and inflexibly than almost any other offense in the State. Only for murder in the first degree is a greater penalty, capital punishment, prescribed by statute (Penal Law, § 125.27). Only arson in the first degree (Penal Law, § 150.20 [causing an explosion in an occupied building]); kidnapping in the first degree (Penal Law, § 135.25); and murder in the second degree (Penal Law, § 125.25) carry the same mandatory life terms. Even a persistent (third) felony offender will be subject to a mandatory life sentence only under special circumstances (see Penal Law, § 70.10, subd 2).
Among class A felonies, the narcotics offenses alone may not *116 be reduced below the class A-III level by plea negotiations (CPL 220.10, subd 6, par [a]). Among class A felony offenders, only those convicted of sale or possession of narcotics are barred from being absolutely discharged from their sentences after five years’ unrevoked parole (Correction Law, § 212, subd 8). Ranked lower than the drug offenses as B felonies carrying a discretionary maximum sentence of 25 years and no minimum sentence, are such serious crimes as manslaughter, kidnapping in the second degree, rape, robbery, and setting fire to an occupied building (see Penal Law, § 70.00, subd 2, par [b]).[1]
Drug trafficking, on the other hand, is a very serious offense itself. As already discussed, it generates collateral crimes, even violent crimes. Moreover, drug-related crimes may be much more prevalent, that is] have a higher and rising incidence, than other crimes comparably punished or equally grave crimes not as severely punished, requiring greater isolation and deterrence.
In comparison with other jurisdictions, drug trafficking is punished more severely in this State than in other jurisdictions (see Corcoran and Helm, Compilation and Analysis of Criminal Drug Laws in the 50 States and Five Territories, in Drug Use in America, op. tit., App, vol 3, pp 240-334, especially pp 293-295). It is also true, however, that drug trafficking is more extensive in New York (see, generally, Brecher, op. tit., p 72 [over half the addict population in the Nation is located in New York City]; Task Force on Narcotics and Drug Abuse, op. tit., p 11). Significantly, California, with a similar drug problem, punishes drug trafficking almost as severely as New York (see Cal Health and Safety Code, § 11352; but cf. Matter of Foss, 10 Cal 3d 910, supra). That the harsh penalties for drug trafficking were prescribed in response to a more prevalent crime problem must be weighed in any "external” comparison.
Summarizing the various factors and comparisons pertinent *117 to gross disproportionality, the Legislature could reasonably conclude that drug trafficking was a grave offense; that the defendants, as sellers, posed a serious threat to society; and that the sentencing statutes, though severe and inflexible, would serve, at least, to isolate and deter. Compared both “internally”, to punishments for other crimes under the Penal Law, and “externally”, to punishments imposed elsewhere for the same or similar offenses, the narcotics laws are relatively severe, but not irrationally so, given the epidemic dimensions of the problem.
On this analysis, the punishments in these cases were not so grossly disproportionate that they may be declared unconstitutional. The Legislature has latitude in determining which ills of society require criminal sanctions, and in imposing, as it reasonably views them, punishments, even mandatory ones, appropriate to each (see, e.g., People ex rel. Prisament v Brophy, 287 NY 132, 136, cert den 317 US 625; Matter of Dodd v Martin, 248 NY 394, 398-399; People v Gowasky, 244 NY 451, 466). That courts may believe that the Legislature is mistaken, does not lessen the legislative power. The statutes were enacted after thorough investigation (see Official Transcripts, Senate and Assembly Committees on Codes, Jan., Feb., 1973; Official Transcripts, Senate Debate on Drug Bills [S6204, S6205, A7328, A7873], April, May, 1973; Official Transcripts, Assembly Debate on Drug Bills, May, 1973; see, generally, 1973 Annual Report of the Assembly Codes Committee, pp 3-7; “Questions [to] and Answers [of]” Governor Rockefeller Following Testimony at Joint Hearing of Senate and Assembly Codes Committees [1973]; cf. Interim Report of the Temporary State Comm, to Evaluate the Drug Laws, Drugs and Drug Penalties Under Review: A Documentary Study, NY Legis Doc, 1973, No. 13, pp 70-72). Rarely has a penal sanction been struck down by the courts of this State as unconstitutional under the cruel and unusual punishments clause, and never on the ground of disproportionality (see People v Fitzpatrick, 32 NY2d 499, 509-513 [under constraint of Furman v Georgia, 408 US 238, supra]). The strong presumption of constitutionality of statutes has not been rebutted (see Weems v United States, 217 US 349, 379, supra; People v Pagnotta, 25 NY2d 333, 337; People v Crane, 214 NY 154, 173, affd 239 US 195; People v Gillson, 109 NY 389, 398).
In so holding, in the exercise of judicial restraint and with respect for the separation of powers, the court does not *118 necessarily approve or concur in the Legislature’s judgment in adopting these sanctions. Their pragmatic value might well be questioned, since more than a half century of increasingly severe sanctions has failed to stem, if indeed it has not caused, a parallel crescendo of drug abuse. The premises upon which the Legislature has proceeded have been subjected to vigorous dispute (see, e.g., United States v Moore, 486 F2d 1139, 1243-1246 [Wright, J., dissenting], supra; Report of the President’s Advisory Comm, on Narcotic and Drug Abuse, pp 3, 40; Drug Use in America, op. cit., pp 250-251; Rosenthal, Proposals for Dangerous Drug Legislation, Task Force on Narcotics and Drug Abuse, op. cit., pp 80, 103; Chambliss, Types of Deviance and the Effectiveness of Legal Sanctions, 1967 Wis L Rev 703, 707-708; Frankel, Narcotic Addiction, Criminal Responsibility and Civil Commitment, 1966 Utah L Rev 581, 587-588). Indeed, the debate moves beyond the wisdom of substituting long mandatory prison terms in place of flexible sentencing, of emphasizing isolation and deterrence over rehabilitation. Even the questions whether "the policy of criminalization, which raises the cost and increases the difficulty of obtaining drugs, does in fact make the drug user a proselytizer of others in order that he may obtain the funds to acquire his own drugs”, and whether "the compulsion of the addict to obtain drugs and the moneys to purchase them causes him to commit collateral crime that otherwise he might not commit”, are questions about which reasonable men can and do differ (see Additional Views to the Report by the President’s Comm, on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, pp 302-303 [Dr. Brewster, Judge Breitel, Mrs. Stewart and Mr. Young]; Drug Use in America, op. cit., pp 170-173; Tinklenberg, Drugs and Crime, App, vol I, pp 242, 270; see, generally, Greenberg and Adler, 3 Contemporary Drug Problems, p 229). Given the present state of criminological knowledge, perhaps only time will tell whether the course pursued will prove effective or will fail as every similar effort since the Harrison Act of 1914 has failed.
The court thus does not pass on the wisdom of the Legislature’s acts. It holds only that, because of the Legislature’s rational view of the gravity of the offenses, the danger posed by the offenders, and the penological purposes to be served, the punishments imposed for these crimes in the present state of man’s knowledge were not grossly disproportionate or cruel *119 and unusual in the constitutional sense.[2] Again, the appellants and their offenses not only technically fit the statutory definition of the offender class, but are also encompassed by legitimate penological purposes as envisioned by the Legislature. This is not to say that in some rare case on its particular facts it may not be found that the statutes have been unconstitutionally applied (cf. Furman v Georgia, 408 US 238, 460-461 [Powell, J., dissenting]).
The other issues, including the alleged trial errors, raised by defendants, have been considered, but they do not require discussion.
Accordingly, the orders of the Appellate Divisions should be affirmed.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
In each case: Order affirmed.

APPENDIX

The Cruel and Unusual Punishments Clause

The origins of the Federal constitutional provision have received extensive inquiry (see, e.g., Furman v Georgia, 408 US 238, 316-322 [Marshall, J., concurring]; People v Davis, 33 NY2d 221, 225-226 cert den 416 US 973; People ex rel Kemmler v Durston, 119 NY 569, 576, affd 136 US 436; see, generally, Granucci, Nor Cruel and Unusual Punishments Inflicted: The Original Meaning, 57 Cal L Rev 839).
The first use of the phrase "cruel and unusual punishments” appeared in the English Declaration of Rights of 1688 (see 2 Story, Commentaries on the Constitution of the United States, § 1903, p 623 [4th ed, 1873]; Hallam, Constitutional History of England, pp 547-549; Granucci, pp 852-855). The Convention Parliament, reacting to the "illegal and cruel punishments” inflicted during the reign of James II, included in the Bill of Rights of 1689 a clause prohibiting "cruel and unusual punishments” to prevent a repetition by the new *120 monarchs, William and Mary (1 W & M sess 2, ch 2, Preamble, cl 10; see Granucci, pp 852-859). There is also evidence that, by inclusion in the bill of the cruel and unusual punishments clause, Parliament intended to reiterate a long-standing English policy against disproportionate punishments (see p 860).
The language of the bill pertaining to cruel and unusual punishments was adopted by George Mason in his draft of the Declaration of Rights of the 1776 Constitution of Virginia, and in 1791 was incorporated with little debate into the Federal Constitution as part of the Eighth Amendment (see 7 Thorpe, Federal and State Constitutions, p 3813; Rutland, Birth of the Bill of Rights, 1776-1791, pp 35-36, 232; 1 Annals of Cong, p 782; see, generally, Furman v Georgia, 408 US 238, 312-322 [Marshall, J., concurring], supra). It is commonly accepted that in adopting the language of the English Bill of Rights and incorporating it in the Eighth Amendment, the framers intended primarily to prohibit torture and other barbaric punishments (see, e.g., Furman v Georgia, 408 US 238, 319 [Marshall, J., concurring], supra; pp 376-377 [Burger, C. J., dissenting]; People v Davis, 33 NY2d 221, 226, supra; but see Weems v United States, 217 US 349, 371-373 ["But surely they (the framers) intended more than to register a fear of the forms of abuse that went out of practice with the Stuarts. Surely, their jealousy of power had a saner justification than that”]; compare Carlson v Landon, 342 US 524, 557 [Black, J., dissenting]; see, generally, Wheeler, Toward a Theory of Limited Punishment II: The Eighth Amendment After Furman v Georgia, 25 Stan L Rev 62, 63, n 7, in which the author suggests that the framers may also have intended to prohibit disproportionate punishments).
Although an integral part of the common law of the State, incorporation of the prohibition of cruel and unusual punishments into this State’s Constitution was a relatively late development. On the other hand, the Massachusetts Code of 1648 incorporated large sections of Nathaniel Ward’s 1641 Body of Liberties, including clause 46 which read: "For bodilie punishments we allow none that are inhumane, barbarous, or cruel” (see 1 Schwartz, The Bill of Rights: A Documentary History, pp 71, 77; Perry, Sources of Our Liberties, p 153; Whitmore, Colonial Laws of Massachusetts, 1630-1686, p 8; Wolford, The Laws and Liberties of 1648, 28 Boston U L Rev 426, 446).
*121 The influence of the Massachusetts Code of 1648 throughout the colonies was great. Ward’s ideas relating to cruel punishments, however, were not as influential as other sections of the code, and were not included in either the Connecticut Code of 1650 or the New Haven Code of 1656 (see Haskins & Ewing, Spread of Massachusetts Law in the Seventeenth Century, 106 U Pa L Rev 413, 415, n 23; 417, n 31). These codes were used as references by Richard Nicolls, Governor of the newly-conquered Colony of New York, to draft the "Duke’s Laws” of 1665 (1 Colonial Laws of New York, pp 6-73; see Haskins & Ewing, p 417). It is not surprising, therefore, that the "Duke’s Laws” contained no prohibition of torture and cruel punishments similar to that in the Massachusetts Code (see Granucci, p 861; see, generally, Note, Law in Colonial New York: The Legal System of 1691, 80 Harv L Rev 1757, 1758-1759). Nor did the New York Charter of Liberties and Privileges of 1683 proscribe cruel punishments (see 1 Colonial Laws of New York, ch 1, pp 111-116 [1st Colonial Assembly, passed Oct. 30, 1683]; see 1 Lincoln, Constitutional History of New York, pp 720-723).
Following the promulgation of the English Bill of Rights in 1689, the Colonial Assembly had opportunity to adopt the bill’s prohibition against cruel and unusual punishments; but it did not (see "An Act declareing what are the Rights and Priviledges of their Majesties Subjects inhabiting within their Province of New York”, in 1 Colonial Laws of New York, ch 10, pp 244-248 [passed May 13, 1691]). This may be because the English Bill of Rights was fully applicable in the colony, and, thus, statutory enactment may have been thought unnecessary (see 1 Lincoln, op. cit, pp 726-727).
At the onset of the Revolution, on August 1, 1776, the Provincial Convention passed a resolution requiring the Committee on the Constitution to prepare a bill of rights "ascertaining and declaring the essential rights and privileges of the good people of this state” (see 1 Lincoln, op. cit., p 490). Although a few propositions common to a bill of rights were included in the proposed Constitution, no formal bill of rights was ever reported by the committee (see 1 Lincoln, op. cit., p 727). Thus, the first State Constitution of 1777 contained no reference to cruel and unusual punishments. It should be noted, however, that article 35 of the 1777 Constitution continued in force the common and statute law of England, subject to alteration by the Legislature, and, therefore, contin *122 ued the English Bill of Bights, including the cruel and unusual punishments clause, as part of the law of New York.
The situation in the State remained unchanged until 1787. By then the Legislatures of six newly-independent States had passed constitutional or statutory prohibitions against cruel punishments (see Va Const, Declaration of Rights, § 9 [1776]; Md Const, §§ 14, 22 [1776]; Del Code Ann, Declaration of Rights of 1776, p 16; NC Const, § 10 [1776]; Mass Const, art 26 [1780]; NH Const, § 33 [1784]). In addition, two States had included in their Constitutions language requiring proportionality of punishments (see SC Const, § 40 [1778]; NH Const, § 18 [1784]). Perhaps inspired by the actions of sister States, the Legislature on January 26, 1787, passed as a statute the "Act Concerning the Rights and Citizens of this State”, which has since been known as the New York Bill of Rights (L 1787, ch 1). Paragraph 8 of the bill, copied from article 10 of the English Bill of Rights, contains the first expression of the prohibition of cruel and unusual punishments in New York: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted” (see 1 Lincoln, op. cit, p 730). The clause was continued in the revisions of 1801, 1813 and in the revised statutes of 1828, by which the original act of 1787 was repealed (see, generally, 1 Lincoln, op. cit., p 728).
Despite the statutory ban on cruel and unusual punishments, constitutional proscription remained 59 years away, A bill of rights was considered by the Constitutional Convention of 1821, but the proposed bill prepared by the Committee on the Bill of Rights made no reference to cruel and unusual punishments (see Report of the Debates and Proceedings of the Constitutional Convention of 1821, pp 102-103; see, also, Journal of the New York State Constitutional Convention of 1821, p 30). This omission is explained by reference to the remarks of Chief Justice Ambrose Spencer, who was chairman of the Committee on the Bill of Rights. The Chief Justice stated that he thought one proposed inclusion in the bill was "quite useless, that restraining from cruel and unnecessary punishments — now no punishment can be inflicted but by law —and if the Legislature pass laws inflicting punishment, the punishment whatever it be, will not be considered by them as cruel” (cf. 1 Annals of Cong, p 782-783 [remarks of Rep. Livermore]). In any event, the proposed bill of rights was not *123 passed by the Convention, apparently because it was thought unnecessary (see Proceedings and Debates, op. cit., pp 171-173, 487).
It was not until 1846 that the prohibition of cruel and unusual punishments was to become a State constitutional limitation. At the Constitutional Convention of 1846, a bill of rights was prepared by the Committee on the Bill of Rights for inclusion in the new Constitution ("Report from the committee on the rights and privileges of the citizens of the State”, in Bishop and Attree, Debates and Proceedings of the New York State Constitutional Convention of 1846, p 196). Contained in section 5 of the proposed bill was the cruel and unusual punishments clause as it reads today (NY Const, art I, § 5; see Bishop and Attree, op. cit., p 196). The committee report indicates that the language of the clause was copied from the Eighth Amendment (see 1 Documents of the New York State Constitutional Convention of 1846, Doc No. 39, p 2). Accepted without debate, the section became a part of the new Constitution (see Croswell and Sutton, Debates and Proceedings in New York State Constitutional Convention of 1846, pp 417-419, especially p 429).
Thus, section 5 of article I of the State Constitution shares a common heritage with the Eighth Amendment. The fact that the constitutional prohibition did not occur until 1846 indicates, however, that there was little fear that the Legislature would ever enact a punishment which could be considered "cruel and unusual” (see Barker v People, 3 Cow 686, 701 [Court for the Correction of Errors, 1824]; cf., generally, 2 Story, op. cit., § 1903, p 623). In this, New Yorkers did not seem to share the doubts expressed by some who were called upon to consider passage of the Eighth Amendment (see 2 Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution, p 111; vol 3, pp 446-448). Adoption of the clause by the Convention of 1846 by no means indicates a change in this attitude; rather, the clause seems to have been included without debate in the Bill of Rights in conformity with the Federal constitutional provision.
It is universally accepted that the Legislature has broad discretion in proscribing conduct as criminal and in determining the proper punishment (see McGautha v California, 402 US 183, 195-196; Weems v United States, 217 US 349, 379, supra; People ex rel. Kemmler v Durston, 119 NY 569, 577, affd 136 US 436, supra; Lawton v Steele, 119 NY 226, 233; Matter of Bayard, 25 Hun 546, 549, supra). It was, however, *124 recognized long ago that "the Constitution of this state confers power upon the courts to declare void legislative acts prescribing punishments for crime, in fact cruel and unusual” (People ex rel. Kemmler v Durston, 119 NY 569, 577, affd 136 US 436, supra; accord Weems v United States, 217 US 349, 378, supra ["our legal duty * * * is invoked”]; Matter of Kemmler, 136 US 436, 446-447, supra ["it would be the duty of the courts to adjudge”]; cf. People v Gillson, 109 NY 389, 398). Thus, the final judgment as to whether a punishment exceeds constitutional limitations is properly a judicial function.
It has been said that the term "cruel and unusual punishments” is not susceptible of precise definition (see Furman v Georgia, 408 US 238, 258, supra [Brennan, J., concurring]; Weems v United States, 217 US 349, 368-369, supra; Wilkerson v Utah, 99 US 130, 135-136; Ralph v Warden, 438 F2d 786, 789, cert den 408 US 942). Nevertheless, certain standards have evolved.
Historical analysis indicates that the constitutional proscription of cruel and unusual punishments was primarily intended to prohibit sadistic and purely degrading cruelty, that is, all forms of torture, whether outright barbarity or inhumane treatment for its own sake (see Weems v United States, 217 US 349, 370, supra; Matter of Kemmler, 136 US 436, 437, affg 119 NY 569, supra; Wilkerson v Utah, 99 US 130, 136, supra; Wilkinson v Skinner, 34 NY2d 53, 59-60; People v Davis, 33 NY2d 221, 226, supra; cf. Trop v Dulles, 356 US 86, 102 [plurality opn of Warren, C. J.]; p 111 [Brennan, J., concurring] [psychological pain]). The constitutional limitation is not, however, confined to the physical or mental suffering inherent in the method of punishment or attending its mode of execution (but see People v Mauceri, 14 AD2d 479; cf. Hartung v People, 22 NY 95, 107; US Code, tit 10, § 855; Military Law, § 130.55). A constitutional "principle to be vital must be capable of wider application than the mischief which gave it birth” (Weems v United States, 217 US 349, 373, supra; see Trop v Dulles, 356 US 86, 103, supra). The courts have recognized that the cruel and unusual punishments clause is "progressive, and not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice” (Weems v United States, 217 US 349, 378, supra; People v Davis, 33 NY2d 221, 226, supra ["the amendment has come to mean much more”]). This evolutionary character was repeated in 1958 in Trop v Dulles (356 US *125 86, 101, supra): "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.”
The flexible nature of the cruel and unusual punishments clause has engendered re-examination of penalties once thought constitutional, in light of the "evolving standards of decency.” In so doing, it has come to be recognized that the constitutional limitation encompasses a cardinal principle of "humane justice”, namely, that punishment should be proportioned to the offense for which it is exacted. Thus, in addition to cruel punishments which are that because they are degrading, barbarous, or painful for their own sake (sometimes in question-begging fashion characterized as inherently cruel), prohibited also are those punishments which are "cruelly” excessive, that is, grossly disproportionate to the crime for which they are exacted (Weems v United States, 217 US 349, 367, supra; People v Davis, 33 NY2d 221, 226, supra). Although of relatively recent vintage, the concept of cruelly excessive punishment has assumed major significance in cases challenging noncapital punishments prescribed by law.
The theory that the punishment should fit the crime is of ancient origin (see, generally, Granucci, pp 844-847). In a day when many offenses were punished by discretionary amercement, or fining, imposition of these amercements was soon abused in an effort to increase royal revenue. Eventually the nobility was compelled to put an end to the ruinous system of discretionary amercement, and in 1215 King John was forced to include in Magna Carta three chapters banning excessive fines (Magna Carta, chs 20-22). Although perhaps more honored in principle than in practice, the prohibition against excessive punishment became a precept of the English common law (see Hodges v Humkin, Bulstrode’s Reports, pp 139-140; see Granucci, p 847; for a discussion of the general severity of the English criminal law in the 18th century, see 1 Stephen, History of the Criminal Law in England, pp 457-492; see, also, 4 Blackstone, Commentaries on the Law of England, pp 369-372 [1st ed, 1769]).
In the Colony of New Amsterdam, despite severe corporal punishments authorized by law, ordinances prescribing penalties for certain crimes recognized that punishment should be inflicted according to the exigency of the case (see, e.g., Ordinance of 1638, in The Laws and Ordinances of New Nether-land, pp 10, 12 [crimes should be punished "according to the *126 circumstance of the case”]; Ordinance of 1656, tit III, p 273. This principle is recognized today in Penal Law, § 105, subd 4). The English prohibition of excessive punishment by amercement was also carried forward in the Colony of New York (see Charter of Liberties and Privileges of 1683, 1 Colonial Laws of New York, ch 1, p 113; ch 10 [1691], p 246). Thus, in many noncapital cases, sentencing courts in England and in colonial New York, in some instances acting without or in excess of statutory authority, "were presumed to take into account circumstances such as the baseness of the offense, the behavior and the age and standing of the defendant” (see Goebel and Naughton, Law Enforcement in Colonial New York, pp 682, 702).
That a cruelly excessive punishment violates constitutional limitations was first advanced in the Supreme Court by Mr. Justice Field in his dissent in O’Neil v Vermont (144 US 323). The punishment imposed in the O’Neil case was 54 years’ imprisonment at hard labor for 307 cumulative offenses of selling liquor illegally. Justice Field, apparently basing his conclusion that the punishment was unconstitutionally excessive upon an intuitive sense that the punishment was disproportionate to the offender’s moral culpability, stated: "The inhibition [of the Eighth Amendment] is directed, not only against punishments of the character mentioned [torture], but against all punishments which by their excessive length or severity are greatly disproportionate to the offences charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted. * * * It is against the excessive severity of the punishment, as applied to the offences for which it is inflicted, that the inhibition is directed” (pp 339-340, 364; for an earlier view of Justice Field’s Eighth Amendment philosophy see Ho Ah Kow v Nunan, 12 F Cas 252 [No. 6546, CCD Cal 1879]; see, also, Matter of Bayard, 25 Hun 546, 549, supra, in which the principle of disproportionality was first mentioned by a New York court, but not applied ["punishments as disproportioned to the offense as to shock the conscience of the community” may violate constitutional limitations]; cf. Gabrielson v Waydell, 135 NY 1, 5, in which the court noted that a master of a vessel has considerable latitude in disciplinary powers allowed to him, though no "cruel or excessive punishment is sanctioned”). Beyond noting that the crime charged was not an offense in New York, the defendant’s residence, and that more *127 serious crimes in Vermont were subject to less severe penalties, Justice Field did not articulate his reasons for concluding that the punishment was disproportionate.
Eighteen years later, in Weems v United States (217 US 349, supra), Justice Field’s disproportionality principle commanded a majority (4-2) of the court participating. In the Weems case, the court had occasion to review a sentence imposed in the Philippines. The penalty involved was cadena temporal, punishments consisting of 12 years’ and 1 day to 20 years’ imprisonment at hard labor, carrying chains at wrist and ankle; civil interdiction; subjection to surveillance for life; and perpetual disqualification from the exercise of civil rights (see 217 US, pp 364-365). All this was for the crime of falsifying entries in a government cash book, "though there be no one injured, though there be no fraud or purpose of it, no gain or desire of it” (p 365). Justice McKenna, reacting with "wonder” at the severity of the punishment, restated Mr. Justice Field’s proportionality principle: "Such penalties for such offenses amaze those who * * * believe that it is a precept of justice that punishment for crime should be graduated and proportioned to the offense” (pp 366-367; see p 368).
The court, in determining that cadena temporal was cruel and unusual punishment, employed a comparative test, that is, it compared the punishments of cadena temporal with lesser penalties prescribed for a variety of more serious Federal crimes, including certain degrees of homicide, and for similár crimes under United States and Philippine law (pp 380-381). Although probably influenced by the unusual nature and inherent cruelty of some of the accessory penalties imposed in addition to imprisonment, the court invalidated the punishments of cadena temporal on the grounds that they violated constitutional limitations "both on account of their degree and kind” (p 377).
Later Eighth Amendment challenges to sentences imposed by law met with little success. In Badders v United States (240 US 391 [Holmes, J.]), the court refused to strike down sentences of concurrent terms of imprisonment and fines for each separable offense of posting letters in furtherance of a fraudulent scheme. It did so by citing the pre- Weems case of Howard v Fleming (191 US 126), in which the court had rejected a claim that 10-year sentences for conspiracy to defraud were cruel and unusual. The citation of Howard v Fleming is significant in that in the Howard case the court expressed *128 strong opposition to one part of the comparative test as advanced in Weems: "That for other offenses, which may be considered by most, if not all, of a more grievous character, less punishments have been inflicted does not make this sentence cruel” (pp 135-136).
Perhaps adulterated by the cruel features of cadena temporal, and undermined by the oblique repudiation of the comparative test in Badders v United States, the disproportionality principle of Weems v United States has been maintained in the Supreme Court since 1910 only through the vehicles of dissents and concurrences (see, e.g., Rudolph v Alabama, 375 US 889, 891 [Goldberg, J., dissenting from a denial of certiorari]; Lambert v California, 355 US 225, 231 [Frankfurter, J., dissenting]; Milwaukee Pub. Co. v Burleson, 255 US 407, 435 [Brandéis, J., dissenting]; Robinson v California, 370 US 660, 676, supra [Douglas, J., concurring]; Trop v Dulles, 356 US 86, 105 [Brennan, J., concurring], supra; United States ex rel. Marcus v Hess, 317 US 537, 556 [Frankfurter, J., concurring]). It should be noted, however, that until 1962 the Eighth Amendment was not held applicable to the States through the due process clause of the Fourteenth Amendment (see Robinson v California, 370 US 660, 666, supra). Thus, Eighth Amendment challenges to sentences imposed in State courts were presumptively foreclosed.
In Furman v Georgia (408 US 238, supra), disproportionality as a basis for declaring penalties violative of the cruel and unusual punishments clause failed to command a majority of the court. Mr. Justice Douglas concentrated in the Furman case on the thesis that the cruel and unusual punishments clause prohibits arbitrary and discriminatory punishments; indeed, he had previously adopted the disproportionality principle (see Robinson v California, 370 US 660, 676, supra [concurring opn]). In the Furman case, Mr. Justice Brennan recognized that the determination that a severe punishment is excessive may be grounded in disproportionality. He stated, however, that the more significant basis is that excessive punishment serves no penal purpose more effectively than a less severe punishment (408 US, p 380; cf. p 309 [Stewart, J., concurring] ["these sentences are 'cruel’ in the sense that they go beyond * * * the punishments that the state legislatures have determined to be necessary”]; p 312 [White, J., concurring] ["A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punish *129 ment violative of the Eighth Amendment”]; but see p 451 [Powell, J., dissenting] [for a critique of this test]). Mr. Justice Marshall concurred in this, carefully avoiding a disproportionality analysis (see pp 331-332). Dissenting, Mr. Justice Powell asserted that disproportionality was a proper reason for condemning punishments as cruel and unusual, but limited it to punishments "grossly” or "greatly” disproportionate to the crime (see pp 451, 456-461). Chief Justice Burger flatly rejected disproportionality analysis (see pp 391-396). Mr. Justices Blackman and Rehnquist joined in both the Chief Justice’s opinion, and in Mr. Justice Powell’s opinion approving disproportionality analysis in limited cases (p 414).
Despite its relative nonuse in the Supreme Court, disproportionality as a basis for declaring punishments cruel and unusual in recent years has taken firm hold in the State and lower Federal courts. For example in Ralph v Warden (438 F2d 786, cert den 408 US 942, supra), the Fourth Circuit Court of Appeals held that the death penalty for the crime of rape without aggravating circumstances is so disproportionate to the offense as to violate the Eighth Amendment. In Hart v Coiner (483 F2d 136, cert den 415 US 983, supra) that same Circuit Court of Appeals held that a mandatory life sentence under a West Virginia recidivist statute was grossly disproportionate to the underlying offenses of writing a check for $50 with insufficient funds, transporting across State lines forged checks in the amount of $140, and perjury. In Matter of Lynch (8 Cal 3d 410, supra), the California Supreme Court struck down that State’s mandatory maximum sentence of life imprisonment as grossly disproportionate to a second offense of indecent exposure (see, also, Matter of Foss, 10 Cal 3d 910, supra, in which a statute precluding parole consideration for a minimum period of 10 years imposed mandatorally upon an offender with a prior drug conviction was held to be so disproportionate to the offense of selling heroin as to violate the cruel or unusual punishments clause of the California Constitution). In People v Lorentzen (387 Mich 167, supra), the court held that a mandatory minimum sentence of 20 years for selling marijuana was so severe as to violate the Eighth Amendment. In Workman v Commonwealth (429 SW2d 374 [Ky], supra) a sentence of life imprisonment without possibility of parole for forcible rape committed by juvenile offenders was held to be unconstitutionally disproportionate to the offense (see, also, cases collected in Matter of Lynch, 8 Cal 3d *130 410, 423, n 13, supra; see, generally, Cruel Punishment— Length of Sentence, Ann., 33 ALR3d 335, 357-359).
Finally, this court in People v Davis (33 NY2d 221, 226, supra) adopted the principle that punishments disproportionate to the offense violate constitutional limitations (see, also, Matter of Bayard, 25 Hun 546, 549, supra).

. The B felonies include arson in the second degree (Penal Law, § 150.15 [causing a fire in an occupied building]); bribery and bribe receiving in the first degree (Penal Law, §§ 200.04, 200.12); burglary in the first degree (Penal Law, § 140.30); conspiracy in the first degree (Penal Law, § 105.15); criminal mischief in the first degree (Penal Law, § 145.12); kidnapping in the second degree (Penal Law, § 135.20); manslaughter in the first degree (Penal Law, § 125.20); rape in the first degree (Penal Law, § 130.35); robbery in the first degree (Penal Law, § 160.15); sodomy in the first degree (Penal Law, § 130.50); and possession of explosives with intent to use unlawfully against the person or property of another (Penal Law, § 265.05, subd 7).

. Because the present analysis, and, for that matter, any legal analysis, is the product of history, attached as an Appendix to this opinion is a history of the cruel and unusual punishments clause in New York, and of its roots in Anglo-American common law and constitutional doctrine.