THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDREW PORTANOVA, Appellant.

Fourth Department, February 25, 1977

*Leslie A. Bradshaw* for appellant.

*Lawrence T. Kurlander, District Attorney (Edward J. Spires* of counsel), for respondent.

MOULE, J. Defendant appeals from a judgment of conviction entered upon a jury verdict which found him guilty of criminal sale of a controlled substance in the first degree and conspiracy in the first degree. He alleges eight separate points of error.

The facts concerning the background and consummation of the sale of cocaine for which defendant was indicted were testified to by James Valvano, the primary witness for the prosecution, who was a codefendant in the indictment under which defendant was charged and who pleaded guilty to a reduced charge of criminal sale of a controlled substance in the third degree. Valvano testified that he knew defendant for seven years and had met him through a mutual friend, Tom August, who lives in Fort Lauderdale, Florida. On January 28, 1975 Valvano telephoned defendant at August's house in Florida to inform him that certain buyers were interested in purchasing eight ounces of cocaine. Defendant then flew from Florida to Rochester, New York, where later that evening defendant transferred to Valvano the cocaine for the sale. During the period from January 29, 1975 through February 3, 1975 arrangements were made by Valvano and defendant for consummation of the sale. On February 3, 1975 Valvano went to the Ramada Inn in Chili, New York, where he sold the cocaine to Frank Magooch and two others, all three purchasers being Federal agents. In return for the cocaine Valvano received $9,000 in $100 bills and returned to his home with the money. It was then that defendant came over to Valvano's house in order to count the money and check for markings on the bills. Defendant left Valvano's house with $8,000 of the total proceeds of the sale. On February 6, 1975 defendant boarded a flight and returned to Fort Lauderdale, Florida.

These facts were corroborated at trial by the testimony of Valvano's fiancée, Kathy Dougherty, Federal Agent Magooch and Donald Miglioratti, employed by the Drug Enforcement Administration Task Force, who provided surveillance on Valvano on the evening of February 3, 1975. Additionally, the District Attorney offered at trial two boxes which were marked Exhibits Nos. 7 and 8 for identification. Exhibit No. 7 contained a total of nine tapes which were marked Exhibits 7-A through 7-I for identification. Exhibit No. 8 contained a total of eight tapes, the record indicating that at least one of these tapes, Exhibit 8-B, was marked for identification. Subsequently, the District Attorney offered into evidence five of these tapes (Exhibits 7-A, 7-B, 7-C, 7-D and 8-B) and, in

particular, 12 phone conversations recorded thereon. These conversations had been monitored and taped pursuant to a warrant issued by court order and were between Valvano, defendant, Magooch and August during the days prior to and following the February 3rd sale of cocaine.[1] The conversations were admitted into evidence and heard by the jury.

Defendant's first contention on this appeal is that the sealing of tapes outside of the court's direct supervision, evidence of tampering with tape recordings and breaks in chain of custody all constitute reversible error.

On February 13, 1975 a number of tapes were brought before the same Judge who had presided at defendant's trial and he ordered that "the District Attorney of Monroe County seal said tapes and maintain the custody of said tapes and direct that they not be disturbed except upon a further order of this Court." The tapes were not sealed in the Judge's presence nor were the boxes in which the tapes were eventually sealed brought to the Judge. Instead a member of the Monroe County Sheriff's office took the individual tapes to the District Attorney's office where he found two boxes and sealed the tapes in those boxes with sealing tape and sealing wax. Defendant objected at trial and asserts on appeal that these tapes were improperly sealed in that they were not sealed in the Judge's presence as required by statute.

CPL 700.50 (subd 2) reads: "Immediately upon the expiration of the period of an eavesdropping warrant, the recordings of communications made pursuant to subdivision three of section 700.35 must be made available to the issuing justice and sealed under his directions." The issue here involves the

---

1. Three phone conversations recorded on Exhibit 7-A were offered and admitted into evidence. These conversations took place during the evening of January 28, 1975 and included a call from Valvano to August's home in Florida, a call from defendant to Valvano and a call from Valvano to defendant at defendant's home in Rochester. Four phone conversations recorded on Exhibit 7-B were offered and admitted into evidence. These conversations took place on the evening of January 29, 1975 and included a call from Federal Agent Magooch to Valvano, a call from defendant to Valvano, a call from Magooch to Valvano and a call from defendant to Valvano. One conversation recorded on Exhibit 7-C was offered and admitted into evidence. This conversation took place on January 31, 1975 and involved a call from defendant to August in Florida. Three conversations recorded on Exhibit 7-D were offered and admitted into evidence. These conversations took place on February 3, 1975 and included a call from defendant to Valvano, a call from Magooch to Valvano and a call from Valvano to defendant. Finally, one conversation recorded on Exhibit 8-B was offered and admitted into evidence. This conversation involved a call from defendant to August at August's home in Florida on February 6, 1975.

interpretation to be accorded the phrase "under his directions" as set forth in the statute. Defendant asserts that this phrase requires that the tapes be sealed in the presence of or by the Justice. We find no support for this conclusion.

The progenitor Federal eavesdropping statute (see US Code, tit 18, § 2518, subd [8], par [a]; see, also, *People v Sher,* 38 NY2d 600) contains substantially identical provisions. In a case interpreting that statute *(United States v Abraham,* 541 F2d 624, 627), the court stated: "We find nothing in the language of § 2518 (8) (a) which requires the presence of the judge as the sealing of the recordings takes place. * * * It was the duty of the Judge under the statute to preserve the recordings as possible evidence. This was done by ordering that the surveillance tapes be sealed and placed in the custody of Agent Simon. The statute directs that the recordings be sealed under the judge's direction, not in his presence." In *People v Nicoletti* (34 NY2d 249) and *People v Sher, supra,* two cases primarily relied upon by defendant for support, the tapes in question were never brought before the court for the purpose of receiving directions for sealing nor were the tapes ever sealed by the authorities. Thus, although it is stated in those cases that the "sealing requirement is to be strictly construed" (34 NY2d, at p 253; see, also, 38 NY2d, at p 603), the facts in those cases are clearly distinguishable from those here. Additionally, neither of those cases stands for the proposition that the tapes be sealed by or in the presence of the Judge.

Here, the tapes were brought before the court and properly sealed according to its directions. Inasmuch as there was substantial compliance with the literal reading of the statute and defendant presents no support for a contrary holding, the sealing procedure in this case was proper.

With respect to defendant's claim of error due to tampering with tape recordings, he specifically alludes to that part of the trial where the Sheriff's deputy, while offering Exhibit No. 8 into evidence, stated that the box contained seven tapes when upon being unsealed and opened it actually contained eight tapes.

Although no explanation was offered at trial by the deputy as to his miscalculation of the number of tapes contained in the box, we see no reason for concluding that this miscalculation was anything more than just that, a mere error on the part of the witness. In his testimony the deputy did state that

the box was in the same condition that he left it in when he sealed it pursuant to the directions of the court on February 13, 1975, thus negating the possibility of tampering from the time the box was sealed until it was opened in court during trial.

Not only did defendant's attorney not object to this occurrence at trial but he failed to pursue the matter at any length during cross-examination of the witness. Additionally, only one conversation from one of the eight tapes contained in Exhibit No. 8 was offered and admitted into evidence by the court. With respect to that one conversation, a full and proper foundation was laid as to the unchanged condition of the tape since its sealing, as well as to the identity and accuracy of the particular conversation.

In light of the above it cannot be said that the evidence supports the conclusion that there was tampering with respect to the tapes contained in Exhibit No. 8 nor that there was any error in admitting the one tape contained therein that proved prejudicial to defendant or deprived him of a fair trial.

Defendant's final claim of error under this contention concerns an alleged break in the chain of custody with respect to the handling of Exhibit 7-D which was one of nine tapes contained in the box marked Exhibit No. 7. An investigator testified that he removed this particular tape from the Drug Enforcement Agency's safe on Feburary 5, 1975 and handed it to one Detective Miglioratti, who opened the tape and resealed it that same day. Although not objecting on this ground at trial, defendant now claims that due to the fact that no evidence was presented concerning what Miglioratti did with that tape upon opening it or what transpired until such time as the tape was returned to the safe, the State has failed to establish the necessary chain of custody with respect to not only that one tape but with respect to all of the tapes contained in Exhibit No. 7.

In *People v Connelly* (35 NY2d 171, 174) the Court of Appeals in referring to the "chain of custody rule" stated that "when the evidence itself is not patently identifiable or is capable of being replaced or altered, admissibility generally requires that all those who have handled the item 'identify it and testify to its custody and unchanged condition'". (See, also, *People v Blanda,* 80 Misc 2d 79.) However, analysis of a chain of custody must be kept within reasonable limits *(People v Julian,* 50 AD2d 760, 761). Thus, "where the circumstances

provide reasonable assurances of identity and unchanged condition and it would be impossible or an unreasonable requirement to produce each physical custodian as a witness, there has been a relaxation of the rule" *(People v Porter,* 46 AD2d 307, 311; see, also, *People v Jamison,* 29 AD2d 973).

Here, the prosecution established with respect to every phone conversation it sought to have admitted, who placed each of the tapes on the machine containing that particular conversation and who removed the tape from the machine. Additionally, the State presented the individuals who actually monitored the particular conversation offered in evidence so as to have them attest to the identity and accuracy of each conversation. With respect to the particular tape in question, Exhibit 7-D, the deputy testified that when he placed that tape on the machine before using it on February 3, 1975 he played it and there was no recording on it at that time. He further testified that he monitored the three conversations on that tape that were admitted into evidence and he attested to their identity and accuracy after they were played in court.

Although there is arguably a question as to what Miglioratti did with the tape during the period in which it was in his custody, the testimony of the deputy provides more than reasonable assurances not only as to the identity and accuracy of the conversations on the tape but also as to the unchanged condition of the tape itself. It would be a burdensome and unreasonable requirement to produce each individual who monitored every conversation on every tape, regardless of whether that tape or the conversation contained therein was sought to be admitted into evidence, in order to establish a reasonable chain of custody.

Furthermore, even if it was determined that Exhibit 7-D and the three conversations contained therein were erroneously admitted, we find no support for concluding that all of the tapes in Exhibit No. 7 must therefore be excluded. In that vein, the remaining evidence adduced at trial, along with the other nine phone conversations admitted into evidence, was more than sufficient to support the guilty verdict and any error in admitting Exhibit 7-D into evidence constitutes harmless error.

Defendant's second contention is that the interpretations of certain words that were spoken in the taped phone conversations were erroneously admitted without foundation.

In particular, defendant alludes to that part of the trial

where an investigator was permitted to testify that the word "cola" means cocaine; that the word "rocky" means a crystal line or higher grade of cocaine; that the word "mix" means an adulterant or diluent; that the word "piece" means an ounce of coke or heroin; and that the word "one" in the sentence, "Don't worry about the dinero, it is all in one," means in $100 bills. Defendant's attorney, although objecting to these statements at trial, fails to cite any authority in support of his contention but merely states that an improper foundation was laid for accepting this testimony.

This same investigator, upon taking the stand, testified to the fact that he had worked as an undercover narcotics agent for approximately seven years. The Trial Judge properly concluded that such testimony was receivable in light of the officer's particular expertise in the narcotics field. However, it was unnecessary to show that he was an expert. Such explanations as the witness testified to here are admissible under the general rule that lay witnesses can testify as to the meaning of statements and that when words have a doubtful, hidden or ambiguous meaning, the person who used them may testify as to their meaning, as may all persons who heard them (People v Irvine, 40 AD2d 560).

The investigator testified that he had previously listened to all 12 phone conversations that were played in the courtroom. Inasmuch as he heard those words being used and based upon his vast experience working in the narcotics area, it cannot be said that he was improperly permitted to interpret the words referred to above.

Defendant's third contention is that certain questions asked by the prosecutor during the course of the trial raised prejudicial inferences that constitute reversible error.

During trial Valvano indirectly referred to one Steve Diamond as the tipster who eventually warned him after the last sale of cocaine that his buyers were government agents. Diamond apparently died before the trial. Defendant contends that the following questioning of Valvano by the District Attorney was an attempt to suggest to the jury that defendant killed or had Diamond killed:

"Q. Are you aware of the fact Steve Diamond died last week [first of June] in Cleveland?

"A. Yes, sir.

"Q. You have been in jail since when?

"A. February 11th."

The other instance where defendant contends an improper inference was sought to be drawn was when the District Attorney, while questioning an investigator on redirect, brought out the fact that $50,000 bail had been posted in the case. Defendant argues that this information was brought out in an attempt to induce the jury to believe that defendant used the proceeds of not only the drug sale in question but possibly other drug sales to enable him to post bail.

Defendant's attorney did not object to these questions during trial. It is well settled that alleged errors, not having been objected to upon the trial, have not been preserved for review (People v Bryant, 31 NY2d 744, 745). However, such alleged errors may be considered, even where no objection has been raised below, where such errors deprived the defendant of a fair trial (CPL 470.15, subd 6, par [a]; People v Winslow, 51 AD2d 824).

With respect to the first series of questions relating to the inference that defendant killed the tipster Diamond, the interpretation of those questions and answers offered by defendant's attorney is far reaching and without any basis in fact. First, that exchange of questions and answers merely indicates that Valvano did not play any role in Diamond's death and any inference that such exchange was meant to implicate defendant in Diamond's death requires an analysis far more in depth than any juror could attempt to undertake during the course of a trial. Second, there is no evidence in the record indicating that Diamond died of anything but natural causes. Finally, there exists the question of why defendant would want to kill a person who warned Valvano and himself of the fact that they were dealing with government agents. There is no support for the conclusion that such an exchange of questions and answers was in any manner prejudicial to defendant.

Similarly, there is no basis for concluding that defendant was prejudiced by the District Attorney eliciting from the witness the fact that $50,000 bail had been posted in the case. There is nothing in the record to indicate that the District Attorney ever saw the bail slip in question or that he was ever aware in what form bail had been posted or by whom. Additionally, such inquiry into the posting of bail was brought out on redirect after defendant's attorney, on cross-examination of the same witness, had posed questions concerning

whether an investigation had been made into defendant's financial condition. Thus, it is arguable that the question asked by the prosecutor on redirect was permissible in light of the matters explored by defense counsel on cross-examination.

In any event, it can be said with certainty that neither the questions nor answers proved prejudicial to defendant or deprived him of a fair trial (see, also, *People v Brosnan,* 32 NY2d 254; *People v Marks,* 6 NY2d 67; *People v De Cristofaro,* 50 AD2d 994).

Defendant's fourth contention is that the District Attorney, during his summation, improperly commented on defendant's failure to testify.

The record reveals that a call was made on February 4, 1975 from defendant's telephone to a telephone in Fort Lauderdale, Florida, identified as that of Tom August, defendant's alleged narcotics supplier. In his summation the District Attorney, in suggesting that defendant took the money from the cocaine sale to the supplier in Florida, said "But here is some more physical evidence for you to take in there. A telephone call placed on February 4th to Ft. Lauderdale, Florida, the very next day, 11:35 in the morning, Tom August phone number, unchallenged, uncontradicted and never mentioned by Mr. Leonardo [defense counsel], but there it is". Defendant's attorney did object to this statement at trial on the ground that it is improper for the prosecution to state that certain of its evidence is uncontradicted in that that is tantamount to commenting on the defendant's failure to testify (see *People v Watson,* 216 NY 565; *People v Fitzgerald,* 156 NY 253).

Although admittedly the prosecutor improperly made such a statement, such error does not necessarily constitute reversible error in every instance. It has consistently been held that where the rights of the defendant are safeguarded by the charge of the trial court and where the evidence of guilt is overwhelming, the error, if any, is deemed harmless *(People v Krische,* 50 AD2d 872; *People v Rolchigo,* 33 AD2d 1060, affd 28 NY2d 644; *People v Maimone,* 9 AD2d 780, affd 7 NY2d 998; see, also, *People v Crimmins,* 36 NY2d 230). Inasmuch as any possible detrimental effect of this error was sufficiently alleviated by the court's charge to the jury and the evidence of defendant's guilt is substantial, such comment can only be considered harmless error.

Defendant's fifth contention urges that the trial court

abused its discretion in not allowing him to enter a plea to a lesser charge.

The defendant and his codefendant Valvano were jointly indicted for the class A-I Felony, criminal sale of a controlled substance in the first degree (Penal Law, § 220.43). Valvano had been permitted to plead to a class A-III felony, criminal sale of a controlled substance in the third degree (Penal Law, § 220.39), in full satisfaction of the joint indictment. Five weeks before trial, defendant was accorded the option of pleading guilty to a class A-II felony, criminal sale of a controlled substance in the second degree (Penal Law, § 220.41) but refused the offer and chose to stand trial. At the time of trial, after eight jurors had been sworn in, defendant's attorney informed the Trial Judge that it had been brought to his attention that the District Attorney would now recommend, subject to the court's approval, a reduced plea to an A-III felony in full satisfaction of the indictment. The court refused to allow such a plea stating that all pretrial proceedings and discussions concerning a reduced plea had been exhausted and that a month prior to trial defendant had rejected an offer to plead guilty to the class A-II felony after a thorough discussion of the matter with his attorney.

CPL 220.10 (subd 3) reads: "Except as provided in subdivision five, where the indictment charges but one crime, the defendant may, with both the permission of the court and the consent of the people, enter a plea of guilty of a lesser included offense." Subdivision five of that section states: "(a) Where the indictment charges one of the class A-I or class A-II felonies defined in article two hundred twenty of the penal law or the attempt to commit any such class A-I or class A-II felony, then any plea of guilty entered pursuant to subdivision three or four must be or must include at least a plea of guilty of a class A-III felony." Read together, these provisions support the fact that defendant could only plead as low as a class A-III felony and then only with the permission of both the court and the People (see *People v Selikoff*, 35 NY2d 227, 241; see, also, *People v Esajerre*, 35 NY2d 463, 467). It is well settled that a court may reject a plea in the exercise of sound judicial discretion *(Santobello v New York*, 404 US 257, 262).

Defendant's sixth contention is that the drug sentencing statute was unconstitutionally applied. Defendant was sentenced as a class A-I felon to the mandatory minimum of 15 years to life (Penal Law, § 70.00, subd 3, par [a]) while his

codefendant Valvano was sentenced by the same Judge on July 1, 1975 to a four years to life term as a result of his plea of guilty to the class A-III felony, criminal sale of a controlled substance in the third degree (Penal Law, § 220.39). Defendant contends that he was denied equal protection of the law because he was not offered the option to plead to a class A-III felony as was Valvano and that he, therefore, received a harsher sentence due to his choice to plead not guilty and stand trial. Defendant asserts that the disparity in sentencing between that meted out to himself and that given to his cohort amounts to cruel and unusual punishment.

The recent Court of Appeals case, *People v Jones* (39 NY2d 694), addresses the identical issue raised here. In that case the defendant, unlike her codefendants involved in a heroin operation, chose to stand trial rather than plead to a lesser crime and receive a lighter sentence. The court held in a 4 to 3 decision that the mandatory sentence of 15 years to life, following a jury conviction, was not violative of equal protection since defendant was convicted of a crime different from that of her codefendants, for which there was a mandatory minimum sentence not applicable to the codefendants (39 NY2d 694). Defendant "received the minimum punishment prescribed by law for the crime of which she was found guilty which crime was different from the ones to which the others chose to plead" (39 NY2d 698).

In the instant case defendant was accorded the option to plead to a class A-II felony, which carries a lighter sentence than that of the crime for which he was convicted, but rejected such offer. Inasmuch as his codefendant Valvano pleaded guilty to a lesser and different crime, it cannot be said that the fact that they both received different sentences violated defendant's right to equal protection.

Defendant asserts that he was discriminated against in that he was not offered the option, as was Valvano, of pleading to a class A-III felony. The District Attorney was under no obligation to treat defendant and Valvano equally, particularly since there exist marked distinctions with respect to their individual involvement in the crimes for which they were indicted. Initially, Valvano co-operated with the police by offering to appear as a witness against defendant and by assisting in other investigations.[2] Furthermore, the record

---

2. There is no evidence in the record that defendant in any way co-operated with the authorities.

shows that it was defendant who initially introduced Valvano to cocaine-selling and who explained the prices of cocaine to him. Finally, it was defendant who maintained the out-of-State contacts to obtain the drugs and who transported them interstate. It is a fair inference to be drawn from the record that Valvano was little more than a local pusher acting at defendant's behest.

In this regard, no constitutional right of defendant was violated in connection with the entire plea bargaining and sentencing process.

Defendant's seventh contention is that the sentencing provisions of the drug laws violate the Eighth Amendment prohibition against cruel and unusual punishment and the Fourteenth Amendment due process and equal protection clauses.

Certain provisions of the drug laws as well as the applicable sentencing provisions of article 70 of the Penal Law were upheld as constitutional in the recent Court of Appeals case, *People v Broadie* (37 NY2d 100), and, as such, their status remains so today.[3] Defendant concedes that this issue has not been decided in his favor but nevertheless wishes to preserve the issue on appeal.

Defendant's final contention is that cocaine is irrationally classified as a narcotic drug for penalty purposes in violation of the Eighth and Fourteenth Amendments.

Although defendant offered no proof on trial concerning the properties and effects of cocaine, he asserts in his brief that cocaine is a nonnarcotic stimulant with which there is no addiction, no tolerance, no withdrawal symptoms and no causal relation with crime and, as such its classification as a narcotic drug (Penal Law, § 220.00, subd 7; Public Health Law, § 3306, Schedule II [a][4]) for which class A felony sentences are mandated, violates the constitutional protections of the Eighth and Fourteenth Amendments.

Inasmuch as it cannot be said that the Legislature acted irrationally and unreasonably in classifying cocaine as a "narcotic drug" and that this issue is truly one that should be dealt with by the Legislature and not the courts, we dismiss defendant's contention.

---

3. The particular provision under which defendant was found guilty (Penal Law, § 220.43) was not dealt with explicitly by the court, although reference was made to the entire statutory scheme encompassing the drug laws (see *People v Broadie,* 37 NY2d 100, 110).

The judgment of conviction should be affirmed.

MARSH, P. J., DILLON, GOLDMAN and WITMER, JJ., concur.

Judgment unanimously affirmed.