OPINION OF THE COURT
Mary Johnson Lowe, J.
Chris Askew, the defendant herein, was indicted with another person, both charged with the class A-III felony of acting in concert in the sale of $20 worth of cocaine. Askew was arrested eight months after the alleged sale. During the course of an omnibus hearing, the evidence revealed that the codefendant had been described in police reports, written shortly after the alleged sale, as a man 5 feet 10 inches tall and weighing 165 pounds. The arresting officer testified that the codefendant, then present in court, was 6 feet 2 inches tall and was of slender build. At the conclusion of the hearing, the codefendant waived a jury trial and was acquitted by this court on the ground that the gross misdescription created a reasonable doubt that he was the person involved.
At a pretrial conference between the attorney for the defendant Askew, the Assistant District Attorney and the court, defense counsel stated that his client wished to plead guilty to a violation of section 220.34 of the Penal Law, a class C felony,[1] in order to avoid the risk of going to trial on the class A-III indictment and face a mandatory life sentence in the event of conviction. The Assistant District Attorney informed the court that there was no evidence that the defendant was a large scale seller, that he was 25 years of age and had never been arrested before, that he was charged with acting in concert in the sale of $20 worth of cocaine and he, the prosecutor, believed the ends of justice and protection of the public would be met if the court considered a sentence of probation. The court indicated that it agreed with the prosecution’s assessment of the case, and approved the plea bargain.[2]
During the formal proceeding of entering the plea, the court inquired of the defendant, if he was guilty of possession of cocaine on the date charged in the indictment. The defendant replied that he had never possessed or sold any drugs on that *756 date or any other date. The court then terminated the proceeding and stated to the defendant that a man who protests his innocence should not plead guilty to any crime, but should go to trial.[3]
The defendant proceeded to trial, which resulted in a verdict of guilt of the class A-III felony sale of cocaine. A few days after the verdict, Juror No. 6 contacted the Assistant District Attorney and expressed his concern about the verdict reached, in light of the mandatory nature of the punishment, which was not known to him at the time of the verdict. The juror asked to speak to the court, and again, in the presence of the attorneys for the prosecution and defense, expressed his anguish at the nature of the mandated punishment in this case. On the date of sentence, the probation report attested to the defendant’s previous good character and the fact that the defendant had never been in any conflict with the law before the instant case. Defense counsel moved to have the sentencing provisions of section 70.00 of the Penal Law declared unconstitutional as applied to the instant defendant.
The Court of Appeals in People v Broadie (37 NY2d 100) had occasion to review the constitutionality of the new drug laws of 1973. In sustaining the mandatory sentencing provisions as legislatively valid judgments and not in contravention of the cruel and unusual punishment clauses of the Federal and State Constitutions,[4] the court set forth (p 112) the factors it weighed in reaching its conclusion as follows: "The gravity of the offense is obviously key, as is the gravity of the danger which the offender poses to society. Given grave offenses committed or committable by dangerous offenders, the penological purposes of the sentencing statutes, whether they be the rehabilitation or isolation of offenders or the deterrence of potential offenders, will be decisive”. The Broadie court found that drug offenses are punished more severely and inflexibly than almost any other offense in the State,[5] however, because of the Legislature’s rational view of the gravity of the offenses, the danger posed by the offenders and the penological purposes to be served, "the punishments imposed for these crimes in the present state of man’s knowledge were not grossly *757 disproportionate or cruel and unusual in the constitutional sense.”[6] (People v Broadie, supra, pp 118-119.) The court’s holding explicitly grounded its finding of constitutionality upon a rational relationship between the gravity of the offense and the penological purpose of the Legislature.[7] The court, after rejecting retribution or stimulus to vigilantism as valid penological purposes, analyzed the mandatory penalties in terms of the valid legislative concerns for rehabilitation, deterrence and isolation.
In noting the high rate of recidivism among drug abusers, the court held that the Legislature had the right to discount rehabilitation as a factor in shaping sentencing policy since it thought that prior efforts at rehabilitation had failed; it found therefore that the Legislature could reasonably shift the emphasis to other penological purposes, namely, isolation and deterrence. In passing upon the constitutional challenge in the instant case, this court accords the legislative judgment great weight and respectful consideration and assumes the constitutional validity of the mandatory life sentence. If a finding is to be made otherwise, the defendant bears a heavy burden of disproving the presumption of legislative reasonableness.
The United States Supreme Court has adopted the position that in examining challenged legislation, the courts are required to review developments which may have changed the validity of information before the Legislature at the time of the statutory enactment.[8] In Leary v United States (395 US 6, supra) the court was presented with a statutory presumption that marihuana possessors had knowledge of the illegal importation of their contraband. Speaking for the majority, Mr. Justice Harlan said (p 38): "Since the determination of the presumption’s constitutionality is 'highly empirical,’ [U.S. v. Ganey, 380 US 63, 67] it follows that we must canvass the available, pertinent data * * * [W]e have not confined ourselves to data available at the time the presumption was *758 enacted in 1956, but have also considered more recent information * * * to ascertain whether the intervening years have witnessed significant changes which might bear upon the presumption’s validity.”
RECENT DEVELOPMENTS
The Association of the Bar of the City of New York published its Final Report of the Joint Committee on New York Drug Law Evaluation in 1977.[9] The report is the result of a project begun shortly after enactment of the new drug laws and its purpose was to collect data concerning the functioning of the new laws and to evaluate their effectiveness. After three years of exhaustive study, the Final Report states that available data indicates that despite the expenditure of substantial resources, neither did the new law deter drug trafficking nor contain its spread. The Final Report’s conclusion may be summarized as follows:
1. A defendant arrested for a drug felony under the old law faced an 11% chance of receiving a prison or jail sentence in the Supreme Court; under the 1973 law, the chance was identical, 11%.
2. Inside the City of New York, fewer drug law cases were disposed of between 1974 and June, 1976 than during a similar period of time under the old drug law.
3. The State’s felony courts imposed 2,551 sentences of incarceration in new law drug cases between early 1974 and mid-1976. This represents about 700 fewer cases than would have been expected under the old law or 200 or 300 per year.
4. Outside the City of New York, prison and jail sentences in drug cases went up dramatically in several counties; yet in none of them was there evidence of sustained reduction of drug abuse.
(a) In Erie County, heroin was as prevalent during the first half of 1975 as it was before the law took effect.
(b) In Monroe County, the new laws had no impact on the extent of drug abuse. Narcotics deaths and serum hepatitis both increased after 1973.
(c) In Nassau County, the number of prison and jail sentences imposed on drug offenders fell during 1974 and 1975. The use of cocaine and the prevalence of poly-drug use in *759 creased. There was no measurable decline in heroin trafficking or use since the enactment of the 1973 laws.
(d) In Suffolk County, no notable decline in heroin use was detected after 1973. There was a rise in the use of barbiturates and cocaine.
In addition to the findings of the Final Report, knowledgeable officials have spoken for publication concerning the efficacy of the 1973 drug laws:
1. New York Times (March 29, 1976): "In March, 1976, the Chairman of the New York State Senate Select Committee on Crime, Ralph J. Marino, referring to the controversal laws, stated, 'It’s obviously not working. We’ve got more narcotics than before and the big pushers are not being prosecuted.’ ”
2. New York Times (Sept. 6, 1976, 1:6): "In September, 1976, the Drug Law Evaluation Project, funded by the Law Enforcement Assistance Administration, released a report finding that the drug laws were ineffective, there being 'fewer dispositions, fewer convictions, and fewer prison sentences’ than in similar periods under the old law. A New York Times study, conducted at the same time, revealed, 'More suspects sentenced to the severest imprisonment appeared to be low-level dealers — not major traffickers in heroin or cocaine.’ ”
3. New York Times (Jan. 2, 1977, 1:5): "In early January of this year, a survey of one hundred New York City judges, who are perhaps the best reliable sources of firsthand information, showed widespread dissatisfaction with the situation. Over half of those questioned said the 1973 drug law had actually worsened the situation by introducing youngsters 16 and under (immune to the severe punishments) into the illicit drug trade.”
4. New York Times (Feb. 8, 1977, 54:1): "In February, the United States House of Representatives Select Committee on Narcotics Abuse and Control reported that New York drug laws were ineffective as a deterrent. 'Drug pushers in Harlem,’ the Committee stated, 'openly traffic in heroin, cocaine, and marijuana, even when they know they are surrounded by police.’ ”
5. Governor’s Memoranda: Guilty Pleas and Sentencing (July 2, 1976)[10] "The bill, which is part of my Criminal Justice Legislative Program, amends provisions of the Criminal Proce *760 dure Law to permit an individual charged with a class A-III drug felony, with the approval of the court and prosecutor, to plead guilty to a class B or class C felony. The bill would also require that a person indicted for a class A or B non-drug felony plead guilty to at least a felony.
"As the law is presently structured, a class A-III drug felony is the only criminal offense for which no lesser plea whatsoever may be entered. This is true despite the fact that limited plea bargaining is permitted in the more serious drug offenses, and unlimited plea bargaining is permitted in all serious non-drug offenses, including murder, arson, rape and kidnapping.
"Since a defendant charged with an A-III felony may not be offered a lesser plea, a disproportionate number of A-III felony cases go to trial. With an average felony trial rate of 10.7% in New York City, the trial rate for A-III felonies is 32%, three times as high. As a result, prosecutors and the courts expend a grossly disproportionate share of their time and resources in prosecuting relatively minor drug offenses, while the more serious crimes of violence are shamefully neglected.
"The Division of Criminal Justice Services, using statistics compiled by the Drug Law Evaluation Project of the Bar Association of the City of New York, estimates that allowing limited plea bargaining in A-III felony cases will result in a saving of from $4 to $6 million a year in criminal justice resources, which could then be used for more speedy and effective prosecution of homicides and other serious violent crimes.
"Last year, a similar bill was vetoed * * * because it would have imposed rigid plea bargaining restrictions on all class A, B and C felonies. That bill was severely criticized for unduly restricting the discretion of the court and prosecutor, which is necessary if each case is to be judged on its individual merits, and injustices are to be avoided.
"The plea bargaining restriction contained in the present bill is limited to only the most serious felonies, and requires only that the lesser plea be to a felony, rather than a misdemeanor. Thus, the objectionable aspects of last year’s bill have been avoided.”
COMMENTARY
In light of the material collected above, it is appropriate to restate the cogent observation made by the Chief Judge in *761 Broadie (37 NY2d 100, 118, supra): "Given the present state of criminological knowledge, perhaps only time will tell whether the course pursued [enactment of the 1973 drug laws] will prove effective or will fail as every similar effort since the Harrison Act of 1914 has failed.” Returning once again to the bare bones of the Broadie decision bottoming constitutionality of the new drug laws upon the validity of the legislative presumption that the epidemic of drug abuse could be quelled only by the threat of inflexible, and therefore certain, exceptionally severe punishment; one must determine whether empirical data collated subsequent to the legislative enactment vitiates or seriously casts doubt upon the continuing validity of the legislative presumption.[11]
The Final Report of the Joint Committee of the Association of the Bar of the City of New York clearly documents the fact that the new drug laws have had no deterrent effect on drug abuse or drug trafficking in the State of New York. This conclusion is shared by State Senator Ralph J. Marino, Chairman of the State Senate Committee on Crime; it is shared by the Select Committee on Narcotics Abuse and Control of the United States House of Representatives; it is also shared by many Judges and prosecutors.
Having examined this persuasive evidentiary showing that the new drug laws have not had a deterrent effect upon drug abuse and drug trafficking, one must then turn to the remaining penological goal cited by the Broadie court, "isolation.”
The Broadie court articulated the "isolation” rationale as follows (supra, p 114): "The Legislature could conclude that the best way to break the chain [narcotics trafficing] would be to remove the seller from society for a long duration, and, upon his return, to continue surveillance through lifetime parole.” This penological goal, found valid by the Broadie court, no longer has any validity when applied to persons indicted for class A-III drug felonies. In 1976 the Legislature amended CPL 220.20 to permit a defendant charged with a class A-III drug felony to plead down to a class C felony. The Legislature also amended subdivision 4 of section 70.00 of the Penal Law to provide as follows: "When a person * * * is sentenced * * * to a class C felony specified in article two hundred twenty, and the court, having regard to the nature and circumstances of the crime and to the history and charac *762 ter of the defendant, is of the opinion that a sentence of imprisonment is necessary but that it would be unduly harsh to impose an indeterminate sentence, the court may impose a definite sentence of imprisonment and fix a term of one year or less.” Governor Carey, in approving this legislation in the memorandum quoted above gave as his reasons for approval the heed to divert judicial and prosecutorial resources from relatively minor drug offenses to more serious crimes of Violence. The Governor also observed that in sentencing class A-IÍI drug felons who have pleaded down to a class C felony, the discretion of the court and prosecutor is necessary if each Cáse is to be judged on its individual merits, and injustices are to be avoided. We are now confronted with a situation where the Governor of the State, in declaring its public policy, implicitly stated that the public would be adequately protected from persons charged with the sale or possession of small amounts of narcotics, those charged enter a plea to a CláSs C felony and discretion is vested in the court and prosecutor to fashion a sentence of one year or less, if an indeterminate sentence is deemed inappropriate in the particular case. In entering a plea to a class C felony, a defendant charged with a class A-III drug felony neither changes the gravity of his offense nor the facts of his previous good or bad character. If the legislative judgment, on a plea, is that the court should apportion its sentence according to the offense and the defendant before the court, what legitimate penological purpose is served by mandating life imprisonment for this same defendant if he chooses to exercise his constitutional right to trial by jury? Mr. Justice Marshall touched upon this problem in his concurring opinion in Furman v Georgia (408 US 238, 356): "Moreover, to the extent that capital punishment is used to encourage confessions and guilty pleas, it is not being used for punishment purposes. A State that justifies capital punishment on its utility as part of the conviction process could not profess to rely on capital punishment as a deterrent. Such a State’s system would be structured with twin goals only: obtaining guilty pleas and confessions and imposing imprisonment as the maximum sanction. Since life imprisonment is sufficient for bargaining purposes, the death penalty is excessive if used for the same purposes.” Former Chief Judge Fuld, in a different context, made a similar observation in People v Oliver (1 NY2d 152, 160): "There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution * * * A legislative *763 mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance.”
In terms of the instant case, the Broadie court found that the mandated life imprisonment sentence in all class A-III drug felonies not only unusual when compared to sentences imposed for similar crimes in other jurisdictions; it also found the sentence severe when compared to sentences for crime within the State, since only murder in the first degree is punished more severely. The court found the legislative scheme did not contravene the cruel and unusual punishment clauses of the State and Federal Constitutions because it found the legislative classification was enacted to enforce the penological goals of deterrence and isolation. Empirical data contained in the Final Report of the Joint Committee on New York Drug Law Evaluation and other authorities cited show that the new drug laws have had no effect on drug trafficking or drug abuse in this State. The amendment of subdivision 4 of section 70.00 of the Penal Law is a legislative declaration that individualized punishment of a year or less, in appropriate cases, protects the public interest where small scale sellers of narcotics are brought before the bar of justice. To paraphrase the words of Mr. Justice Marshall in Furman v Georgia (supra) to the extent that New York State uses the life imprisonment provisions of the new drug laws to encourage confessions and guilty pleas, such penalties are not being used for punishment purposes. If not used for legitimate punishment purposes, they contravene the cruel and unusual constitutional interdictions.
When one lays the mandatory life imprisonment provision of the 1973 narcotics laws beside the discretionary sentencing mandated under the 1976 amendment to subdivision 4 of section 70.00 of the Penal Law, one realizes that the exact same crime is involved — the sale of $20 worth of cocaine — the only difference in utilization is that life imprisonment is mandated if the defendant exercises his constitutional right to go to trial and loses, while probation may be imposed if he pleads guilty. Where the defendant professes his innocence or where the evidence of guilt is seriously arguable, does the State in plea bargaining negotiations have a legitimate inter *764 est in laying on the bargaining table a choice of plea plus probation or trial plus mandatory life? Can one truly say that a defendant who opts for the plea plus probation has made a "voluntary choice”[12] or has the State so loaded the dice that the hazard of the roll chills the free exercise of the trial alternative?[13]
The Legislature’s presumption in 1973, that the new narcotic laws would serve the valid penological ends of deterrence and isolation, has been rebutted on the facts in this case. The imposition of a life sentence upon the defendant, Chris Askew, following his conviction, after trial, of the class A-III sale of cocaine is grossly disproportionate to the sentence he would have received if he had pleaded to the class C felony under CPL 220.20 as amended in 1976. This court cannot find any valid penological purpose to be served in inflicting on this defendant the second most severe punishment in this jurisdiction, for the same offense the Legislature decreed a sentence of one year or less would adequately protect society had this defendant pleaded rather than chosen a trial alternative.
The infliction of punishment, particularly where its severity serves no valid penological purpose is cruel and inhuman. In imposing sentence on the defendant herein, this court will be guided by the standards of subdivision 4 of section 70.00 of the Penal Law. Based on this defendant’s prior good record, the small amount of cocaine involved, letters of commendation received by this court from people in his community and this court’s judgment that an indeterminate sentence is not necessary and would be unduly harsh, this court imposes a definite sentence of one year.

. CPL 220.20 makes section 220.34 of the Penal Law a lesser and included crime of section 220.39 of the Penal Law (class A-III) for plea purposes.

. CPL 220.50, subd 4.

. People v Selikoff (35 NY2d 227, 235); People v Lederhilger (41 AD2d 569).

. NY Const, art I, § 5; US Const, 8th Amdt.

. Murder in the first degree authorizing capital punishment is the only crime punished more severely. Arson in the first degree, kidnapping in the first degree and murder in the second degree carry the same mandatory life sentences.

. The severity of a penalty is constitutionally suspect if it serves no valid penological purpose. This principle was alluded to by Mr. Justice Stewart, writing the plurality opinion in Gregg v Georgia (428 US 153, 182-183), where he stated: "Although we cannot 'invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology’ * * * the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering.”

. The citation from Gregg (supra) and the Broadie court recognize the equal protection classification glosses upon Eighth Amendment issues.

. Leary v United States (395 US 6).

. Hereinafter referred to as Final Report.

. Governor’s Memoranda: Guilty Pleas and Sentencing (NY Legis Ann, 1976, p 395).

. Leary v United States (395 US 6, supra).

. Tollett v Henderson (411 US 258).

. United States v Jackson (390 US 570).