OPINION OF THE COURT
Jerome Hornblass, J.
The following constitutes the opinion, decision and order of the court.
The defendant was convicted of criminal sale of a controlled substance in the second degree, a class A-II felony, on January 31, 1983. In the ordinary course of events the court would have no alternative but to impose a statutory mandatory sentence of imprisonment of not less than three years to life. However, due to the nature of the events that transpired subsequent to the conviction, the court finds the interests of justice would best be served by granting the defendant’s motion and not imposing the mandatory sentence.
BACKGROUND
To place the present Clayton motion that is before the court in proper perspective, the following narration of *922 events is set forth, encompassing the court’s finding of facts. (See People v Clayton, 41 AD2d 204.)
Defendant’s trial commenced January 25 and ended on January 31, 1983. The People alleged that the defendant, Ernesto Insignares, had sold less than two ounces of cocaine to an undercover officer for $3,800. Defendant took the stand in his own defense. He asserted he had merely delivered a package as a favor for a friend, the codefendant, Cesar Garay, without knowledge of its contents. On the afternoon of January 31, 1983, at approximately 2:45, the jury convicted the defendants, finding Insignares guilty of criminal sale of a controlled substance in the second degree.
Insignares had remained free during the trial on $200 bail set by another Judge. As is required by CPL 530.40 (subd 3), bail could no longer be continued after conviction, and the defendant was remanded. Having observed the defendant’s demeanor during the trial, I was apprehensive of his ability to survive jail. When remanded, therefore, I instructed the correction officers who were taking him away to immediately place the defendant in administrative segregation and put him under a suicide watch. Such an indorsement was in fact made on Insignares’ commitment card which accompanied him to Rikers Island.
The purpose of ordering this special commitment was to provide the defendant with the full panoply of special preventative institutional safeguards for prisoners at Rikers Island. This includes close supervision of inmates, especially the newer ones, to prevent attack by other inmates or possible suicides. I further believed, and had no reason to doubt, that making such orders was an uncontested judicial function and that the Department of Correction would obey the court’s mandates in recognition of its constitutionally vested original jurisdiction in law and equity over criminal cases prosecuted by indictment.
The defendant was transported to Rikers Island early the next morning, February 1, at approximately 1:00 a.m. During the processing of the defendant he passed through several holding pens in C-95 until finally he was placed in cell 6 at approximately 4:30 a.m. There were 25 to 30 other inmates with the defendant. In the back of the holding pen, *923 the defendant found an empty corner, spread his coat over the concrete floor and lay down to sleep. A short time thereafter he was awakened by an attack of five inmates. Two of the inmates silenced and held him down on the floor while the other three forcibly sodomized him anally. During this attack strongly worded threats were whispered in his ear warning him that he would be killed if he reported the incident. A noise distracted his assailants and he was released.
On Friday, February 4, Insignares was brought back to the court to participate in a hearing. At that time Insignares requested permission to address the court. He declared that he had been raped by five black inmates which led him to an aborted suicide attempt.
Court was recessed in order to establish the veracity of defendant’s statements and to inquire why the judicial orders given had not been honored. I happened to meet Benjamin Ward, the New York City Commissioner of Correction, at the courthouse steps. He stated then, and later elaborated in his testimony at the Clayton hearing and in a memorandum of law promulgated by the department’s legal counselors, that it was entirely within the province of the Department of Correction to determine the conditions of a prisoner’s confinement and that a Judge had no lawful authority to issue orders regarding his confinement.
I ordered that Insignares be kept at Bellevue Hospital until the adjourned date of February 8, pending receipt of the examination reports by the court. It was further stated on the record that in view of Commissioner Ward’s apparent refusal to heed judicial directives, the court would follow up over the weekend by contacting Bellevue to determine if Insignares was in fact there as ordered.
The Department of Correction received the court’s order directing that the defendant be taken to Bellevue. Later that afternoon, at the same time that Commissioner Ward directed the Inspector General of the Department of Correction to conduct an investigation of Insignares’ charge of rape, he also sought further clarification of the court’s order as he felt the court had exceeded its authority. He succeeded in having the Administrative Judge of the court *924 issue an overriding order that Insignares be taken to Rikers Island Hospital instead of Bellevue. After being taken to Rikers Island, Insignares was transported to Bellevue for a quick physical examination. As soon as the examination was completed, he was returned to Rikers Island Hospital.
On Saturday night, I ascertained that Insignares was at Rikers Island instead of Bellevue. I made an appointment and proceeded to Rikers Island. I toured the hospital area where Insignares was located and spoke with him for a few minutes to inquire about his health. I found the defendant in satisfactory condition and under the scrutiny of nearby guards. I was satisfied that he was safely housed and treated appropriately. I then inspected the reception area, site of the alleged rape, and departed at about 1:00 a.m. Sunday morning.
On February 25, the defendant brought a Clayton motion to dismiss the charges against him in the interests of justice pursuant to CPL 210.40. This was predicated to a significant extent upon the charge that the defendant had been forcibly raped. The court granted a hearing on the motion on March 28, and after a broad, exhaustive inquiry involving many witnesses and a transcript exceeding 2,100 pages, testimony was concluded on June 24, 1983.
CONCLUSIONS OF LAW TIMELINESS OF MOTION
The People have raised the issue of the timeliness of this Clayton motion and have sought to have the court deny it as untimely brought. CPL 255.20 (subd 3) states in relevant part that a “pre-trial motion made after the forty-five day period [from arraignment] may be summarily denied, but the court, in the interest of justice, and for good cause shown, may, in its discretion, at any time before sentence, entertain and dispose of the motion on the merits.” As elucidated in the commentary to this section, “a court must entertain and decide any pre-trial motions, even if not made within the requisite forty-five days, based on grounds of which the defendant could not, with due diligence, have been aware or which for other good cause could not reasonably have been raised within the forty-five day *925 period.” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 255.20, p 440.)
The main impetus for this Clayton motion was the allegation that Insignares was raped during his postconviction incarceration. There was no lack of due diligence on the part of the defenses in bringing the motion and good cause has clearly been shown for the court to entertain the motion in the interest of justice prior to sentence (cf. People v Zagarino, 74 AD2d 115, 119).
THE CLAYTON MOTION
In People v Davis (55 Misc 2d 656) the court in interpreting the predecessor of CPL 210.40 (subd 1) stated that its purpose “is to give a court power in appropriate but rare circumstances to allow the letter of the law gracefully and charitably to succumb to the spirit of justice” (at p 659). It is a legislative act designed to grant broad discretion to a Judge in order to insure that fairness is an intrinsic part of our judicial system. Thus a Judge is given authority to seek and pursue justice by amplifying, expanding and interpreting on a case-by-case basis the boundaries permissible to dismiss in the interest of justice. In deciding such a motion it has been held that a court must sensitively balance the interest of the individual and the State. (People v Kwok Ming Chan, 45 AD2d 613.) Keeping these considerations in mind, the court makes the following determinations in regard to the statutory criteria governing such a motion.
(A) History, character and condition of the defendant
The defendant is a 36-year-old resident of Jackson Heights, Queens. Upon arrival in the United States from Colombia in 1965, he worked diligently up through a series of jobs ranging from employment in a factory to restaurant work as a busboy and finally a captain. While working in this capacity at the Plaza Hotel he attended the Wilfred Beauty Academy and became a hairdresser. He started working as a hairdresser in other beauty salons and eventually opened his own shop in Queens in 1979. This was developed into a successful enterprise employing five other hairdressers. His expertise was acknowledged by many in the field. He sold the shop in 1980 and unsuccessfully *926 sought suitable employment in Miami. He returned to New York City, again opening his own salon in Jackson Heights, which he continued to operate until his incarceration.
The defendant has been the mainstay of his closely knit family residing in Jackson Heights. He has been a devoted son to his aged parents. He has provided emotional and financial support to his older sister. He paid the tuition at parochial school for his 13-year-old niece and was a father figure for her. This is the defendant’s first involvement with the law.
The defendant is a concerned civic-minded businessman who has demonstrated his commitment to bettering his neighborhood and the lives of the residents of the Jackson Heights community. He is known in the community as an organizer and guide as attested to by witnesses for the defendant. In sum, the defendant has led a hardworking, law-abiding, constructive life marred only by this first incident of criminal behavior. The current condition of the defendant will be discussed below.
(B) Any exceptionally serious misconduct of law enforcement officials in the investigation, arrest and prosecution of the defendant
There has been no preconviction misconduct on the part of the authorities. However, the failure of the Department of Correction to comply with the court’s instructions subsequent to the defendant’s conviction has been set forth and must be considered in light of this motion.
Inmates have a due process right secured by the Eighth and Fourteenth Amendments that entails reasonable protection from acts of violence and sexual assault perpetrated by fellow inmates. Prison officials have a correlative duty to exercise “reasonable care to prevent prisoners from intentionally harming others or from creating an unreasonable risk of harm.” (Woodhous v Commonwealth of Virginia, 487 F2d 889, 890; Penn v Oliver, 351 F Supp 1292; Van Horn v Lukhard, 392 F Supp 384.)[1]
*927 The court in Van Horn {supra, p 387) stated: “The Court finds the factual allegations described herein particularly disturbing because the alleged sexual assaults took place in the receiving dormitory during the first day of the plaintiff’s incarceration. Prison officials may have a greater duty to provide new inmates adequate protection during their transition from civilian life to incarceration because new inmates will often be unfamiliar with the realities of prison life and will, therefore, be less adept at avoiding situations which could lead to sexual assault, and in defending against such assaults. Furthermore, subjection to gang rape and sodomy during the first day of incarceration hardly sets an appropriate prelude for ultimate rehabilitation. Consequently, the Court views the allegations in plaintiff’s complaint as of such a serious and shocking nature as to state a violation of the Eighth and Fourteenth Amendments.” In an institution where assaults are not uncommon, a prisoner may get court relief in the way of protection or segregation even before an actual assault. (See Hold v Sarver, 442 F2d 304.)
Insignares had a right to be safe and secure and reasonably protected from violence and sexual assault while housed in a correction facility. Here, the duty of the prison officials to protect Insignares from even one assault was greater due to the court-ordered administrative maximum protection and suicide watch. Prison officials were guilty of an egregious failure to provide security to a particular inmate as ordered and their failure caused Insignares to suffer a cruel and unusual punishment — the defiling act of being raped.
(C) The purpose and effect of imposing upon the defendant a sentence authorized for the offense
Through the hearing considerable evidence was presented on the purposes and effect of a prison sentence on individuals in general and on Insignares in particular.
The evidence presented included psychiatric evaluations. Prison administrators, social scientists and other experts in the field of penology testified to prison conditions generally and how the defendant would fare in the prison environment.
*928 The two disinterested witnesses were the court-appointed psychiatrists, who are employed by the Forensic Psychiatric Clinic of the Supreme Court.
Robert Ellobogen, chief psychologist of the clinic, found that the defendant: “is not at all like the great majority of those in the criminal population. He lacks an exploitive, manipulative, anti-social orientation, and the skills and knowledge to cope with the criminals in the penal system. The exposure he has had already should prove sobering enough to serve as a corrective for any bad judgment he may have exercised.”
Howard Owens, M.D., also a psychiatrist in the clinic, made the following prognosis: “There does not appear to be a significant risk of personality decompensation in this defendant should he be incarcerated for a prolonged period. His usual method of maintaining himself (e.g., being ingratiating and projecting all aggression onto others) are unlikely to stand up to the expectable environment of prison, and he appears to be particularly poorly equipped to defend himself. It is difficult to construe how incarceration could be therapeutically beneficial to him; it appears to be more likely that he would become increasingly depressed and perhaps suicidal and would very likely need continuing psychiatric supervision as long as he was incarcerated.”
The People sought to counter the evidence of the probable severe consequences of incarcerating the defendant through the testimony of Dr. Robert Chalemain, attending physician and psychiatrist for the forensic psychiatry unit at Bellevue Hospital, and Hillel Bodek, a clinical social worker in forensic mental health service at the same unit. Their testimony contrasted sharply with the psychiatric evidence inveighing against incarceration; this divergence of opinion is attributable to their disbelief of Insignares’ charge of rape.
This court adduces the following:
(1) The arrest, correction and jailing of the defendant has had a sobering effect, thereby creating , a sufficient deterrent against further criminal activity.
*929 (2) The effect of being victimized in jail has caused the defendant to suffer permanent psychological damage which has emotionally crippled him.
(3) The media exposure of the defendant’s allegation of rape as well as the defendant’s demeanor, operates to make him increasingly vulnerable and heightens the possibility of further attack in the prison environment by other inmates.
(4) Given the defendant’s present psychological makeup, he will not be able to cope with further imprisonment.
Courts in appropriate cases have not hesitated to declare the imposition of a particular punishment to be unduly harsh, oppressive or severe and thus in violation of the cruel and unusual punishment clause of the Eighth Amendment.[2]
The defendant had not been sentenced when placed in the custody of the Department of Correction, but did suffer attack while under their control. Though the court is aware that rape is not statutorily exempt as per the Eighth Amendment principles, we nevertheless find that the assault should be considered in any further sentencing. “The infliction of punishment, particularly where its severity serves no valid penological purpose is cruel and inhuman” (People v Askew, 93 Misc 2d 754, 764, affd 66 AD2d 710).
(D) Any other relevant fact indicating that a judgment or conviction would serve no useful purpose
The People have taken the position that the defendant’s allegations are untrue and are fabricated to gain the sympathy of the court and to avoid punishment. The People have further urged the proposition that they do not rise to a compelling factor, consideration or circumstances warranting Clayton relief. After carefully considering all of the evidence the court has determined the People’s contentions must be rejected.
The court finds the defendant credible in his failure to make immediate outcry or to report the rape until his court *930 appearance on February 4. It is understandable in light of the death threat which he received from the perpetrators.
In view of this brutal initiation into the prison system on his first night of incarceration, it is not surprising that this passive individual would be intimidated into silence and fear for his life. This is especially true given that he remained at Rikers Island with his assailants.
The physical examinations of the defendant at Bellevue revealed anorectal swelling and a rectal tear that were consistent with a forcible anal sodomy. While at Bellevue, Correction Officer German DuBois went to defendant’s aid in the bathroom. He observed defendant holding a bundle of toilet paper to his rectum and the toilet bowl was red from blood.
CONCLUSION
Based on the credible evidence, this court has concluded that the defendant was raped during the first night of imprisonment, after his conviction. Known to many in his community as a responsible law-abiding citizen, the 36-year-old defendant had a constitutional right to expect humane confinement. Instead, his human rights were violated by the violence committed by inmates against him. The punishment meted out on that first night for this first offender constitutes a greater punishment for the crime then this court could legally or morally impose. Although not ordered by the court or agents of the State, a cruel and unusual punishment nonetheless has been inflicted upon the defendant. This basic violation of defendant’s human rights could have been prevented if the simple instructions of this court were properly heeded by correction officials. To the extent that the Department of Correction failed to protect the defendant from this attack, it must share some of the blame for the occurrence. The assault has had a devastating effect on Insignares. Indeed, the two expert witnesses from the Department of Mental Health’s Forensic Psychiatric Clinic for the Criminal and Supreme Courts, Drs. Ellobogen and Owens, depict the defendant as being emotionally crippled and sure to continue suffering in the future from the assault as well as from his incarceration.
*931 This court which carefully observed the defendant throughout the trial and hearings finds him credible. It also concludes that the trauma of the attack against him plus the nine months already spent in jail is sufficient punishment.
In the sensitive balancing of the interests in this unique case, the court has determined that justice cannot be served either to society or this defendant by imposing the mandatory minimum sentence of three years to life imprisonment. This individual has suffered enough for this type of crime.
Finally, this court rejects the legal claims of the petitioners and the efforts by the Special Prosecutor to force me to abandon this case (Matter of Johnson v Hornblass, 93 AD2d 732) and opts to continue to preside over this case. This court did not submit to the pressures of recusal because the independence of a Judge must be preserved. Surely, it is easier to abandon principles and flee one’s conscience for the sake of ephemeral popularity. Judges, however, must be prepared, in fulfillment of their oath of office, to fearlessly and uncompromisingly defend the sanctity of all individuals appearing before the Bench.
In rejecting the demands for recusal I was cognizant that my orders were thrice rejected by the Department of Correction. The main argument for recusal by the prosecutor was my visit to the jail on February 5,1983. Yet, had I not gone I would have been derelict in my duty, for my orders were being rejected by a prison system which, in order to ensure compliance with civil and human rights, has been under the watchful eye of a learned and insightful Justice from the Federal judiciary, Judge Morris Lasker.
In refusing to recuse, this court was also mindful of the odious practice of Judge shopping by litigants (People v Wallace, 84 Misc 2d 619).
The public is best served by a judiciary which is diverse and independent. Each Judge is the sum total of experiences, attitudes, values, philosophy and wisdom. In the final analysis, it is the legitimate and wholesome differences among Judges based on intellectual and emotional foundations which is the lifeblood of the judiciary. Litigants ought to foster and preserve that individuality, not *932 destroy it. Litigants, including prosecutors, have an obligation to ensure that justice is done which includes protecting the rights of an accused (People v Lofton, 81 Misc 2d 572).
Accordingly, the defendant is paroled forthwith and the indictment will be dismissed in the interest of justice. The dismissal order is stayed for one year during which time the defendant is to be placed under the interim supervision of the Department of Probation. During this period it is hereby ordered that for a total of 400 hours the defendant use his hairstyling talents to teach that skill to troubled youngsters at the J-Cap facility at 90-14 161st Street, Jamaica, New York, 11432, and further ordered to style the hair of patients at a nursing home to be selected by the Department of Probation.
When the supervision period is satisfactorily completed the dismissal order will be signed and the docket sealed.

. The court is mindful that the recognizable authorities cited above are in the field of governmental torts. The court is also cognizant of the limits of the analogy.

. The cruel and unusual punishment clause of the Eighth Amendment is applicable to the States through the due process clause of the Fourteenth Amendment. (Furman v Georgia, 408 US 238; Robinson v California, 370 US 660.)