THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ERNESTO INSIGNARES, Respondent.

First Department, June 25, 1985

### APPEARANCES OF COUNSEL

*Steven Chananie* of counsel (*Robert M. Pitler* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Richard Emery* (*Eric Saltzman* with him on the brief), for respondent.

### OPINION OF THE COURT

Per Curiam.

The question presented on this appeal by the District Attorney, is whether, after a jury convicted defendant of the crime of a criminal sale of a controlled substance in the second degree (Penal Law § 220.41), Criminal Trial Term abused its discretion by setting aside that verdict and dismissing the indictment, upon the ground that such action was required in the interest of justice?

Luis Ramos (Ramos) was a member of the New York City Police Department (Department) for approximately 15 years at

the time of the instant trial in 1983. He was a detective, spoke Spanish fluently, and was detailed to work with the Drug Enforcement Administration Task Force (Task Force). We take judicial notice (*Hunter v New York, Ontario & W. R. R. Co.,* 116 NY 615, 621-622)[1] of the fact that the Task Force is a joint effort of Federal, State and local law enforcement officers, whose primary function is to apprehend persons engaged in the illegal narcotic drug traffic, who operate on a level above that of the dealer who makes an occasional $5 or $10 street sale.

The usual assignment that Ramos performed with the Task Force was as an undercover officer, and that was the assignment he was performing when, on July 16, 1981, he met with an informant named Louis Gomez (Gomez). The purpose of their meeting was for Gomez to introduce Officer Ramos to a person named Cesar Garay (Garay). In order to put Ramos into immediate touch with Garay, Gomez telephoned Garay and handed the telephone to Ramos. In pertinent part, Ramos testified at trial that: "I said to * * * Garay * * * my friend [Gomez] tells me that you are a reliable person, I understand that you have a product that I am interested in. Cesar Garay said, 'Yes, but I think we should discuss this in person.' With that, I said, that's fine * * * [Also] he [Garay] asked me * * * what kind of work I do * * * [and] I said that I worked for a photographic equipment company * * * Then I left by saying, I'll call you [Garay] the next time if I have the opportunity so we could talk."

Thereafter, Ramos telephoned Garay, at his place of business, on July 21, 1981, to arrange a meeting; but Ramos was not available on the date that Garay suggested. Then, on August 25, 1981, Ramos again telephoned Garay, and this call was made to Garay's residence. As a result of that call, these men arranged to meet at approximately 8:15 P.M. that evening at 66th Street and Woodside Avenue, in Queens. During this conversation, Ramos testified at trial that: "I gave a description of my person and I * * * told Garay that I was driving a red truck * * * In turn, Mr. Garay gave me his description."

At the appointed time and place Ramos met Garay, and invited Garay into the truck. The conversation in the truck took place in Spanish and, in substance, Ramos testified at trial that: "after the * * * first greetings * * * I'm Louie [Ramos], I'm Cesar [Garay] and we shook hands. Cesar asked me * * * what can I do for you. At this time I said, 'Look, you know, I have been doing

---

1. See, for recent commentary on the continuing viability of this *Hunter* case, Weinstein, *Coordination of State and Federal Judicial Systems,* 57 St. John's L Rev 1, 8, n 25.

business for a long time. I like to know if we could do business together. If you tell me that, you know, you're going to deliver one day, a certain time, I gonna [sic] be there. If you think that you could do that, we could do business.' We went into talking about quantities of cocaine. He [Garay] said that he could deliver a pound from someone that he knew. I [asked] him * * * what kind of quality he had. He said, 'Well, I have the best quality, uncut cocaine.' I asked him, you know, how much would that go for a pound. He said that * * * for one pound, $29,000 * * * Garay gave me a * * * business card with a name of the realty company [where Garay worked] and told me to call him the next day [Aug. 26, 1981] around noon to confirm the deal".

The next day, August 26, 1981, Ramos telephoned Garay to confirm the deal, and Garay replied that he would "contact my man, call me back around three o'clock." Pursuant to this instruction, Ramos telephoned again at 3:00 P.M., and now Garay told Ramos "that he had contacted his man and that he was ready to deliver the pound [of cocaine] * * * He told me that I was going to meet him * * * that night between 9 and 9:30 at the vicinity of 74th Street and Roosevelt Avenue [in Queens] at the Essex Restaurant."

According to Ramos' testimony, before this meeting, at about 7:00 P.M., Garay telephoned Ramos and reported "that he [Garay] had spoken to his man Tony and that Tony was ready to deliver only five ounces. I asked Garay why he only wants to deliver five ounces and he said, 'because * * * he [Tony] doesn't know you and he wanted to do this first and then * * * we'll do other business' * * * I said, 'Okay, I'll go to the meet * * * and I will speak to Tony and I'll see what I could * * * arrange with him' ".

Garay, who was the codefendant at trial, testified that the defendant's nickname was Tony; that he had first met defendant through Garay's wife, who was a close friend of defendant's; and, that, usually when Garay bought cocaine, he bought it from the defendant.

Accompanied by another member of the Task Force, who was also a New York City Police Detective acting in an undercover capacity and whose name was Jose Guzman (Guzman), Ramos drove to the subject meeting in the vicinity of the Essex Restaurant. Upon arrival, Ramos exited the vehicle and left Guzman in it. A short time later, as Ramos was standing outside the Essex Restaurant and looking through its window to see if Cesar Garay was inside, the defendant came over to Ramos. According to Ramos' trial testimony, now "he [defendant] asked me if I was

looking for Tony. I said, 'No, I'm not looking for Tony. I'm looking for Cesar.' At this point Tony [defendant] said, 'I'm here to make the deal, Cesar is not coming, he went with his wife to see a ball game' * * * I said, 'Do you have the merchandise?' He said, 'Yes, but I only have two ounces' * * * I said * * * 'I am ready to buy the pound. Why, what's the reason why you can't do the pound?' He [defendant] said * * * 'No * * * I can do the pound, it's because I don't know you. If you buy from me these two ounces now, we could do the pound tomorrow with no problem.' * * * I said, 'if I buy the two ounces now and I buy the pound tomorrow, could we * * * continue * * * doing business?' He said, 'That's no problem, we could do business * * * anytime you want, weekly basis * * * any amount you want. But you must get these two ounces first.'"

Subsequently, Ramos and defendant walked over to the car, which had brought Ramos and Guzman to the subject meeting, and at the invitation of Ramos, defendant entered this car so that he could meet Guzman, who was playing the undercover role of the person with the money to buy the cocaine. Ramos testified at trial that: "I asked * * * [defendant] to tell * * * [Guzman] why he didn't deliver the pound. And he again mentioned the fact that * * * he didn't know me [Ramos] but that in the future he would do * * * business with us if we took the two ounces. I asked * * * [defendant] to show me the two ounces * * * [defendant] went into a shoulder bag that he was carrying and produced two plastic bags containing white powder which he handed over to me. With this, I asked him * * * how much is that and he said * * * [its] gonna cost you $1,850 each ounce * * * I took the two plastic bags and I looked inside the bag and I said to * * * Guzman, 'All right, we'll take the two ounces.'" Shortly after this announcement by Ramos, Guzman produced a brown bag with money and, while defendant was looking into the money bag, Guzman placed defendant under arrest.

Later that night, following defendant's arrest, Garay was also arrested.

By a three-count indictment, filed on September 18, 1981, the Grand Jury of the Special Narcotics Courts of the City of New York charged defendant and Garay with the crime of a criminal sale of a controlled substance in the second degree, and two counts of the crime of criminal possession of a controlled substance in the third degree (Penal Law § 220.16).

The Office of the Special Narcotics Prosecutor for the City of New York conducted the prosecution of defendant and codefendant Garay.

In substance, the People's case against the defendant and Garay consisted of the testimony of Ramos, mentioned *supra,* of Guzman and of a chemist. This chemist, who was named Frederick Martorell (Martorell), testified, in pertinent part, that he had been employed by the Drug Enforcement Administration for 12 years; that, during the course of that time, he had performed approximately 5,000 chemical analyses; and that, when he tested the contents of the two plastic bags that defendant gave Ramos in the car, Martorell found that they contained 1.95 ounces of cocaine, whose purity was 55% or more than *double* the usual purity of the cocaine he tested.

Both defendant and Garay testified in their own behalf at trial.

In substance, defendant contended that on the evening of August 26, 1981, he was merely delivering a package to Ramos, as a favor to Garay because Garay had to go to a baseball game, and that defendant did not know what the package contained.

The testimony of codefendant Garay did not support defendant's version of the events. In substance, Garay contended that, when he met Ramos on August 25, 1981, the evening before the arrests, he told Ramos that, if he wanted to buy cocaine, he would have to deal directly with the defendant, and Garay allegedly gave Ramos defendant's telephone number. Furthermore, Garay testified that, after leaving Ramos on August 25, he quickly telephoned defendant and told him "listen, this guy [Ramos] is going to give you a call [about buying cocaine] * * * you want to deal with him, you deal with him."

On January 31, 1983, this case went to the jury. In less than two hours they returned a verdict of guilty against the defendant and Garay of the crime of a criminal sale of a controlled substance in the second degree, which is a class A-II felony (Penal Law § 220.41). The minimum sentence that may be imposed upon conviction of an A-II felony is not less than three years to life (Penal Law § 70.00).

During the trial defendant had been free on $200 bail; but, in view of the fact that he had been convicted of an A-II felony, the trial court, in compliance with CPL 530.40 (3), remanded defendant, and set February 28, 1983 as the day for sentence. Due to the apprehension felt by the trial court about the defendant's ability to survive incarceration, it ordered that defendant be placed in administrative segregation and put under a suicide watch.

As a result of a posttrial bail application, four days later, on February 4, 1983, the defendant returned to court with his

counsel. After denying this application, the trial court granted defendant's request to address the court. In substance, the defendant informed that court: (1) that, during the early morning hours of the day following his remand, after conviction, to Rikers Island, he allegedly had been raped in a holding pen filled with prisoners; (2) that, the alleged rapists had been "five black guys [who] jump and cover me, and they used me"; (3) that he complained to the correction officers about the alleged rape and they allegedly dismissed his complaint by telling defendant "it happens everyday"; and (4) that the alleged rape led defendant to an aborted suicide attempt.

In response to defendant's claim that he had been the victim of a sexual assault, the trial court recessed in order to investigate the defendant's allegations, and to determine why its prior orders to the personnel of the New York City Department of Correction, to administratively segregate and to maintain a suicide watch concerning defendant, had not been implemented.

The trial court set forth what occurred during the recess and the rest of that afternoon in a written opinion (*People v Insignares,* 121 Misc 2d 921, 923-924), and it stated, in pertinent part:

"I [Justice Hornblass who was the trial court] happened to meet Benjamin Ward, the New York City Commissioner of Correction, at the courthouse steps. He stated * * * that it was entirely within the province of the Department of Correction to determine the conditions of a prisoner's confinement and that a Judge had no lawful authority to issue orders regarding his confinement.

"I [then] ordered that [defendant] be kept at Bellevue Hospital until the adjourned date of February 8, pending receipt of the examination reports by the court. It was further stated on the record that in view of Commissioner Ward's apparent refusal to heed judicial directives, the court would follow up over the weekend by contacting Bellevue to determine if [defendant] was in fact there as ordered.

"The Department of Correction received the court's order directing that the defendant be taken to Bellevue. Later that afternoon, at the same time that Commissioner Ward directed the Inspector General of the Department of Correction to conduct an investigation of [defendant's] charge of rape, he also sought further clarification of the court's order as he felt the court [Justice Hornblass] had exceeded its authority. He succeeded in having the Administrative Judge [Justice Milton Williams] of the court issue an overriding order that [defendant] be taken to Rikers Island Hospital instead of Bellevue."

Additionally, on the afternoon of February 4, the trial court, at the request of defendant's counsel, appointed Richard Emery (Emery), Director of the New York Civil Liberties Union (NY-CLU), as "Special Counsel" for the defendant, in the capacity of *amicus curiae,* allegedly pursuant to the guidelines of the Code of Judicial Conduct, Canon 3 (A) (4), to determine if defendant's rights while at Rikers Island had been violated.

Moreover, Justice Hornblass wrote in his opinion *(People v Insignares, supra,* at p 924) that: "On Saturday night [February 5 and 6] I ascertained that [defendant] was at Rikers Island instead of Bellevue. I made an appointment and proceeded to Rikers Island. I toured the hospital area where [defendant] was located and spoke with him for a few minutes to inquire about his health. I found the defendant in satisfactory condition and under the scrutiny of nearby guards. I was satisfied that he was safely housed and treated appropriately. I then inspected the reception area, site of the alleged rape, and departed at about 1:00 A.M. Sunday morning."[2]

Before the proceedings in open court on the adjourned date, February 8, Emery and another NYCLU attorney interviewed defendant in the holding pens at the courthouse. After these attorneys completed their conversation with defendant, they had an ex parte conference with Justice Hornblass. It appears that on February 8, Justice Hornblass again ordered that defendant be taken to Bellevue Hospital.

On February 25, 1983, defendant moved pursuant to CPL 210.40 to dismiss the indictment in the interest of justice. Our examination of the moving papers in support of this motion indicate that they rely heavily for their merit upon defendant's alleged mistreatment at Rikers and defendant's assertions that he is psychologically unfit for imprisonment. Significantly, in defendant's own affidavit in support of his motion he does not either discuss his conviction, nor does he assert that he is innocent of that crime.

The People responded: (1) by opposing defendant's motion; and (2) by making their own motion that Justice Hornblass recuse himself from all further posttrial proceedings since, *inter alia,* he: (1) held an ex parte conference with the NYCLU attorneys;

---

**2.** Justice Hornblass states at pages 7-8 of his opinion in *People v Insignares,* which was filed with the court, that he was accompanied on his Rikers Island visit "by my nephew, Lawrence Goodstein". This reference to Mr. Goodstein does not appear in the official report of this opinion (appearing at 121 Misc 2d 921) and at the end of the official report of that case appears (at p 932) the words "[Portions of opinion omitted for purposes of publication.]"

(2) made a midnight visit to Rikers; and (3) that the NYCLU was brought into defendant's case as an advocate rather than as a friend of the court.[3]

Thereafter, on March 28, 1983, Justice Hornblass denied the People's recusal motion as being without merit. Subsequently, the People petitioned this court, pursuant to CPLR article 78 for an order in the nature of a writ of prohibition to prohibit Justice Hornblass from presiding over the posttrial proceeding concerning the determination of defendant's CPL 210.40 motion.

In our memorandum decision, in *Matter of Johnson v Hornblass* (93 AD2d 732), we unanimously denied the People's application and dismissed the petition. Nevertheless, we noted, at page 733 of that decision: "Although Justice Hornblass may not be disqualified pursuant to section 14 of the Judiciary Law, canon 2 of the Code of Judicial Conduct requires that a Judge 'avoid impropriety and the appearance of impropriety'. Canon 3 (subd C, par [1]) calls on the Judge to disqualify himself when his 'impartiality might reasonably be questioned'. It provides in pertinent part: 'A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding'. Indeed it is upon this and other sections of the canons that the People primarily rely. And while sufficient has not been shown to establish such an abuse of discretion on the part of the respondent in denying recusal to warrant our intervention, we suggest that the 'appearance of justice' might be better served by his recusal. We are confident that he recognizes, as do we, that judicial proceedings should never be conducted save in a manner and under circumstances that reflect complete impartiality. Not only must there be no partiality, in fact, even the appearance of partiality is to be avoided."

On March 28, 1983, Justice Hornblass granted defendant a hearing in respect to his CPL 210.40 motion. The transcript of that hearing contains more than 2,100 pages, which is more than double the length of the trial transcript.

At the hearing, 20 witnesses testified, of which 12, including the defendant, were defense witnesses, and 8 were witnesses for the People.

---

**3.** The court notes that in the appeal herein, it was Emery of the NYCLU who submitted the brief and presented the oral argument on behalf of the defendant.

In substance, the defense testimony concentrated on five subjects. First, evidence of defendant's good character, based upon: (a) his community activism, particularly among the Hispanic population, in the Jackson Heights, Queens, neighborhood in which defendant lived and operated his beauty shop; and (b) defendant's close ties to his family. Second, psychiatric evidence to the effect that, due to the psychological scars that defendant bears from his alleged rape in prison, he will probably be unable to cope with further incarceration. Third, evidence: (a) that the prison system will allegedly be unable to protect the 36-year-old defendant, who is physically small and allegedly nonaggressive, from, *inter alia,* sexual attacks by other inmates; and (b) that incarceration of this first-time drug offender defendant, in a prison system filled beyond capacity, will serve no deterrent purpose. Fourth, evidence that the dismissal of the defendant's case will not have an adverse effect on the public's perception of the criminal justice system, and this evidence was supplied from an allegedly random telephone survey of 234 persons, who live in New York. Fifth, evidence of the alleged rape, which came from the defendant's own testimony.

In pertinent part, the defendant testified that the alleged rape took place in a crowded cell that he shared with 20 to 25 black, white and Hispanic inmates; that he did not recall how many of these prisoners were black, white and Hispanic; that among the Hispanic prisoners was his codefendant Garay; that the rape allegedly occurred in the early morning hours when he was sleeping on the floor in a corner of the cell; that he was allegedly awakened by a black hand over his mouth and four other allegedly black men were holding him down on the floor; that he believed these men were black because of the alleged color of their hands; that as "they started to push my pants down. They told me not to talk and not to say anything because otherwise they would kill me. Three of them started to rape me. I couldn't do anything. After a while we heard noises and they let me go"; that, after the alleged rapists released him, he went to a window and tried to get the attention of a correction officer; that this officer allegedly told defendant "shut-up, and go back to sleep"; that the defendant admitted he did not tell this officer about the alleged attack; that now he sat down next to codefendant Garay; that later on in turn the occupants of his cell were permitted to go to the bathroom; that in the bathroom defendant discovered that he was bleeding from the rectum, so "I cleaned myself" and left his underwear there; that subsequently, along with 12 or 15 of the other prisoners in the cell, defendant was taken to a doctor to be examined, as part of the processing procedure; that he did

not tell that doctor about the alleged attack, even though the doctor examined his rectum; that, due to his alleged depression, the night after the alleged rape, he tried to commit suicide, but another inmate prevented him from accomplishing that act; and, the first time he reported the alleged rape was, as mentioned *supra*, to Justice Hornblass in court on February 4, 1983, which was several days later. Although defendant was medically examined several times by medical personnel in Rikers Island and at Bellevue Hospital after his February 4 court appearance, it was not until February 23 or 24 that a specialist at Bellevue discovered a "small rectal tear". According to one of the defendant's medical witnesses, such a rectal tear is consistent with a forcible rape.

The objective of the testimony of the People's witnesses was to point out that allegedly no objective evidence supported defendant's claim that he had been raped. In substance, the People's evidence was to the effect: (1) that, after the defendant made his rape complaint on February 4, the Inspector General of the Correction Department (IG) made an investigation, and, as a result of that investigation, the IG was unable to confirm defendant's statement that he had been raped; (2) that, during the course of the IG's investigation, six of the inmates, who were in the same holding area with the defendant at the time the alleged rape took place, were interviewed; and (3) that one of these interviewed inmates testified at the hearing, in pertinent part, that, in his opinion, such a rape could not have taken place, in view of the racial mix of the prisoners, since the Hispanic inmates would have intervened if black inmates had tried to sexually assault a Hispanic. Moreover, an inmate named Bernard Valyo (Valyo) testified, in pertinent part, that sometime after defendant made his complaint of rape to Justice Hornblass, he and defendant were in the Rikers Island Hospital together; that the defendant allegedly told Valyo that he was neither raped nor did he attempt to commit suicide and that he had inserted a hairbrush into his rectum to create false evidence of the rape; and that Valyo, even though he had read about defendant's contention of being raped in the daily newspapers, claimed that he was telling the truth. On rebuttal, defendant admitted that he had spoken to Valyo, but he denied telling Valyo that he had lied about being raped, and attempting suicide.

We also find it significant that on the day of the alleged rape, defendant was interviewed by a psychologist, one Nicholas Mikijanic. By coincidence, defendant knew Mikijanic for about two years, as the psychologist and his wife were customers at defen-

dant's hair salon. Although Mikijanic and the defendant spoke for about 1¼ hours, the defendant never informed the psychologist that he had been the victim of a rape.

The IG said that the pen where the alleged rape occurred is lighted 24 hours a day and that the officer's station provides a clear view of the interior of the pen.

After the completion of this so-called *Clayton* hearing (*People v Clayton,* 41 AD2d 204), the trial court granted defendant's CPL 210.40 motion, set aside the jury verdict and dismissed the indictment.

We disagree, and find that the trial court abused its discretion by failing to properly balance the 10 statutory criteria set forth in CPL 210.40, in that the interests of the defendant and the State were not considered equally. We find that the trial court unfairly favored the defendant. As the court stated in *People v Clayton* (*supra,* at p 208), there is a "sensitive balance between the individual and the State that must be maintained in applying the test of the interests of justice".

In pertinent part, CPL 210.40 states:

"In determining whether [some] compelling factor, consideration, or circumstance exists [which requires dismissal in furtherance of justice], the court must, to the extent applicable, examine and consider, individually and collectively, the following:

"(a) the seriousness and circumstances of the offense;

"(b) the extent of harm caused by the offense;

"(c) the evidence of guilt, whether admissible or inadmissible at trial;

"(d) the history, character and condition of the defendant;

"(e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;

"(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;

"(g) the impact of a dismissal upon the confidence of the public in the criminal justice system;

"(h) the impact of a dismissal on the safety or welfare of the community;

"(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;

"(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose."

We have made our own independent analysis of these criteria, based upon the facts in the instant case, and find the following:

(a) The defendant was found guilty by a jury, who deliberated less than two hours, of selling almost two ounces of high quality cocaine for almost $4,000. Furthermore, the defendant was negotiating a further sale of a pound of cocaine for $29,000. We note that the defendant told Detective Ramos that he could deliver any amount of cocaine he wanted anytime Ramos wanted it.

(b) On the scale that the defendant engaged in it, we do not view drug dealing as a victimless crime. The evidence shows that defendant was introducing large amounts of drugs into the community.

(c) Our review of the record of trial leads us to conclude that overwhelming evidence supports the jury verdict. In passing, we note that the trial court concedes that "the defendant's guilt was established after trial and is no longer a contested issue" (see, page 15 of the trial court's opinion filed with the court, which opinion, as mentioned *supra,* in n 2, contains material not contained in the published opinion).

(d) The fact that defendant may have been good to his family and a community activist, who had no previous criminal record, in no way overcomes the fact that he was convicted by a jury of his peers of being a sophisticated cocaine dealer. Some of the psychiatric testimony at the *Clayton* hearing described defendant as "shrewd and cunning" and "manipulative". Also, not to be ignored is the callousness of defendant in supplying cocaine to his friend codefendant Garay, for over a year, to feed Garay's addiction. We do not believe that a person with good character sells drugs to friends or strangers.

(e) The trial court conceded that "[t]here has been no preconviction misconduct on the part of the authorities" (*People v Insignares, supra,* at p 926). The alleged misconduct on the part of the correction authorities took place postconviction and has no relevancy herein. Our research fails to turn up a single appellate decision in this State that has held that postconviction misconduct on the part of the authorities justifies the setting aside of the conviction and the dismissal of the indictment of the purveyor of illicit drugs.

(f) through (j) In respect to the criteria contained in these subdivisions they have been discussed *supra.* It is common knowledge that "[t]he drug seller * * * is at the root of the pervasive cycle of destructive drug abuse" (*People v Broadie,* 37 NY2d 100, 112, *cert denied* 423 US 950).

After our evaluation of these criteria, both individually and collectively, we conclude that there was no justification to dismiss this indictment.

We share the trial court's well-intentioned concern that prison inmates be protected from assault, including rape. Nevertheless, we hold that in the instant case, even if the defendant was, in fact, raped while incarcerated awaiting sentencing, such sexual assault is irrelevant to the defendant's jury conviction of the sale of almost two ounces of cocaine for nearly $4,000.

This defendant participated in a substantial drug sale, despite his effort to minimize his complicity. The record clearly shows he sold almost two ounces of cocaine, to an undercover officer, for almost $4,000. In addition, he was offering to sell a pound for $29,000. It was testified at trial that defendant was accompanied by a "lookout". The cases cited by defendant where drug sales were dismissed in the interest of justice were cases where the defendants became involved due to juvenile poor judgment. This defendant is 36 years of age.

As a result of our finding of irrelevancy to the underlying conviction of the alleged assault, the defendant is not without remedy. If defendant desires, among other things, (1) he can institute a civil rights action against the prison authorities, pursuant to 42 USC § 1983; and (2) he can request either that he be placed in administrative segregation or in a special prison unit for "victim prone" inmates. The trial court concedes that "[i]n an institution where assaults are not uncommon, a prisoner may get court relief in the way of protection or segregation even before an actual assault" (*People v Insignares, supra,* at p 927).

Recently, we decided the case of *People v Varela* (106 AD2d 339 [1st Dept]). In *Varela* (*supra,* at pp 339-340), we stated, in pertinent part, that:

"Despite the strength of the People's case against defendant, as well as defendant's apparent active involvement in the narcotics trade * * * [Trial Term] nevertheless granted defendant's motion to dismiss 'in the interests of justice' * * *

"In its decision [Trial Term] noted defendant's lack of a prior criminal record, his 'exemplary' background at work * * * and as a civic affairs volunteer * * *

"Neither the criteria set forth in CPL 210.40 nor the reasons advanced by [Trial Term] constitute compelling factors that clearly demonstrate that conviction or prosecution of defendant would constitute or result in injustice (CPL 210.40; *People v Rickert,* 58 NY2d 122).

"The fact that defendant has no prior criminal record is insufficient to justify a dismissal in the interests of justice (*People v Andrew*, 78 AD2d 683). His 'exemplary' background, likewise, does not immunize him from the normal processes of the criminal law * * * defendant * * * committed this crime out of greed, not financial need or to obtain money to support a drug addiction * * * [Trial Term's] action, therefore, in dismissing * * * was an abuse of discretion".

The foregoing excerpts, quoted from the *Varela* decision, we find equally applicable in the instant case.

The trial court's discretion to dismiss in the interest of justice, should be "exercised sparingly" and only in that "rare" and "unusual" case where it "cries out for fundamental justice beyond the confines of conventional considerations". (*People v Belge*, 41 NY2d 60, 62-63; *People v Belkota*, 50 AD2d 118, 120; *People v Kwok Ming Chan*, 45 AD2d 613, 615-616 [1st Dept].) These standards have not been met here.

In summary, after examining the trial record, the criteria contained in CPL 210.40, and the record of the *Clayton* hearing, we conclude that the instant case is not one of those rare instances that warrants the exercise of the dismissal power provided a trial justice under CPL 210.40 (*see, People v Litman*, 99 AD2d 573).

Accordingly, the order of the Supreme Court, New York County (Jerome Hornblass, J.), entered February 10, 1984, which granted defendant's motion, pursuant to CPL 210.40, to, in the interest of justice, set aside the defendant's jury conviction for a criminal sale of a controlled substance in the second degree (Penal Law § 220.41) and dismissed the indictment, should be reversed, on the law, defendant's motion denied, the indictment and jury verdict reinstated, and the matter remanded for sentence.

MURPHY, P. J., ROSS, LYNCH and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on February 10, 1984, unanimously reversed, on the law, defendant's motion is denied, the indictment and jury verdict is reinstated, and the matter is remanded for sentence.