*864 OPINION OF THE COURT
Ruth Pickholz, J.
The defendant, Josephine,[1] a 21-year-old hearing impaired, learning disabled individual,[2] with no prior record, was tried jointly with her 16-year-old sister, Joanna, on one count of intentional assault. Both sisters were charged with scratching the face of the complainant, Marisol, during a school yard skirmish initially involving only Joanna and Marisol who were classmates in a special education program. Joanna, a youth, was tried before the Bench at the same time her adult sister’s case was heard by the jury. The court acquitted Joanna on November 18, 1992. The jury convicted Josephine the same day.
After Josephine’s conviction, defendant’s attorney made a postverdict motion for a dismissal in the interest of justice pursuant to GPL 170.40.[3]
HISTORY OF CASE AND DEFENDANT’S HEARING DISABILITY
The chief antagonists to this incident were teenagers Joanna and Marisol. The adolescents attended the same special education program in a New York City school. As the testimony unfolded, it became apparent that there was an ongoing, petty immature rivalry between the girls. Earlier, on the day of the incident, words had been exchanged and the unpleasantries continued outside the classroom. A physical fight ensued and others, including Joanna’s older sister, the defendant, became embroiled.
As a result of the fight, Marisol suffered scratches to her face which were bleeding when she went home. After Marisol’s mother found herself dissatisfied with the school director’s response to the situation, she took her daughter to the hospital some 24 hours after the incident and contacted the police.[4]
*865 Although the evidence of Josephine’s involvement will be fully examined later, suffice it to say that there were no allegations that she was involved in the skirmish at its inception. Josephine did not attend the school on the date of the incident, nor had she any previous contact with the complainant. Her only reason for being outside the school was to meet her younger sister Joanna.
Both sisters testified on their own behalf. Not until Josephine’s testimony was it brought to light that she too was learning disabled, having spent several years in special education classes. Josephine also testified that she had some hearing problems. The court noticed the guttural nature of Josephine’s speech and suspected some type of disability. At times her speech was incomprehensible and unintelligible. Several times she had to be asked to repeat herself by the court and ironically, at one point, a juror indicated difficulty in understanding, stating, "I have a hearing problem too.” The court believed that had there been a significant issue, defendant’s attorney would surely make the appropriate motions.
After defendant Josephine’s conviction, the court ordered an investigation by the Department of Probation and adjourned the case for sentence. The probation report established that Josephine suffers from a significant hearing impairment.
The report indicated that due to serious academic problems in school, Josephine was evaluated in 1980 and was diagnosed with a congenital hearing defect. As of January 1988, her receptive vocabulary was found to be 8V2 years below her expected age level and her ability to process basic linguistic concepts and abstract language was found to be six years below grade level. Her full scale I.Q. was scored at 70 and the Board of Education’s evaluation found her to have "profound language deficit resulting from her original hearing loss.”
Although the court believed that the report raised several important issues as to the fairness of the trial procedure, defense counsel insisted that he had no problems communicating with his client, nor had he noticed any speech defect. Despite this, the court felt compelled to order an updated audiological exam, psychological exam and all past school records of the defendant. Although it was clear that the defendant had never been taught how to sign, an oral interpreter[5] was ordered to be present at all subsequent court proceedings in order to assist the defendant in lip reading.
*866 Pursuant to the court’s order, an audiology test was conducted at St. Lukes Roosevelt Hospital on February 19, 1993. The report received by the court was so highly technical that it was of no real assistance. Because of this, and on notice to all parties, the court contacted Cynthia Campos Mackins, the administrator of the exam, and requested a layperson’s explanation of the results of the test.* *[6]
The audiological report as explained by Ms. Mackins in a letter dated March 19, 1993, indicates that Josephine suffers from hearing loss in both ears due to nerve damage which is not medically treatable and is a result of some "chromosomal accident.” According to Ms. Mackins, the defendant, in a quiet, sound proof environment, could understand 92% of a list of words presented at normal conversational levels. No testing was performed to evaluate Josephine’s ability to hear in the presence of competing background noise. "Indeed the presence of competing noise may well impact on her ability to detect and discriminate sound.” (See, Mar. 19, 1993 letter.) Basically, the test indicated that when Josephine is in a quiet setting, facing the speaker, she is at her optimal hearing ability.
Unfortunately, the courtroom is not the optimal setting for a hearing impaired individual. The acoustics are poor, background noises are prevalent and with the defendant sitting at counsel table, she necessarily faces an attorney’s back when a witness is being questioned. From all the documentary evidence provided, there can be no dispute that the defendant is hearing impaired nor can there be any dispute that due to this impairment and the courtroom acoustics and configuration, much of the trial may not have been comprehended, understood or heard by the defendant. In this regard it should be noted that throughout the trial, Josephine sat passively, registering no emotion or facial expression. Once the oral interpreter appeared at the postverdict proceedings, the defendant became noticeably more animated, interested and involved, confirming to the court that these services would have been invaluable and necessary at the trial.
Under New York Judiciary Law § 390 when a hearing *867 impaired person is a party to a legal proceeding, the court is required to appoint a sign language interpreter. In People v Rivera (125 Misc 2d 516, 527 [Sup Ct, NY County 1984]), the court analogized the predicament of a hearing impaired individual without an interpreter to that of a non-English speaking defendant without a language interpreter. Clearly, a non-English speaking defendant could not meaningfully assist in his/her own defense without the aid of an interpreter. A hearing impaired person is similarly deprived of due process in court proceedings conducted without assistance. Therefore, although Josephine is not totally “deaf’, she is hearing impaired and this court finds her to be entitled to the services of an interpreter. The fact that Josephine is able to hear a list of words given her in a controlled test setting does not mean she has the ability to hear testimony given in a narrative style at a trial. Even assuming that she was able to hear 92% of the trial, that percentage is not enough to satisfy due process. A defendant is entitled to hear 100% of the proceedings.
The fact that no request for assistance was made on Josephine’s behalf does not preclude postverdict relief. Recently, the court, in People v Mabauk (NYLJ, May 19, 1993, at 24, col 5 [App Term, 1st Dept]), the court reversed a conviction where a non-English speaking defendant was not afforded an interpreter at trial. The court held that when it is “acutely obvious” that an interpreter is required, a specific request for assistance is not necessary (at 24, col 6).
If the only flaw in this case was the failure to provide the defendant with the services of an interpreter, the appropriate remedy would be to set aside the verdict and order a new trial. However, upon examination of the relevant factors as set forth in CPL 170.40, this court finds compelling reasons to authorize an outright dismissal.
INTEREST OF JUSTICE RELIEF
A dismissal in the interest of justice is required when “some compelling factor, consideration or circumstance” exists “clearly demonstrating that conviction or prosecution of the defendant * * * would constitute * * * injustice.” (See, CPL 170.40 [1].) Dismissal should be ” ’exercised sparingly’ and only in that ’rare’ and ’unusual’ case where it 'cries out for fundamental justice beyond the confines of conventional considerations.’ ” (People v Insignares, 109 AD2d 221, 234, lv denied 65 NY2d 928, quoting People v Beige, 41 NY2d 60, 62- *868 63; People v Howard, 151 AD2d 253, 256, lv denied 74 NY2d 811.)
CPL 170.40 sets forth the factors to be considered individually and collectively in determining the appropriateness of dismissal. The court must make a value judgment based upon a "sensitive balancing” of individual and State interests in assessing its reason for this remedy. (People v Benevento, 59 AD2d 1029 [4th Dept 1977], citing People v Clayton, 41 AD2d 204 [2d Dept 1973].)
A dismissal in the interest of justice will not be upheld when the court acts because it is displeased with what it regards as an unreasonable plea offer by the prosecution. (People v Molfino, 178 AD2d 238, 241 [1st Dept 1991].) Nor can a dismissal be justified because a conviction would impose a hardship on the defendant’s family, since the effect upon a family does not constitute a "rare and unusual” case that cries out for justice. (People v Reyes, 174 AD2d 87, 90 [1st Dept 1992].) Further, a defendant’s lack of prior convictions, when charged with serious offenses impacting on the safety and well-being of society, does not constitute extraordinary circumstances that would justify a dismissal. (See, People v Harmon, 181 AD2d 34 [1st Dept 1992].)
These cases and others highlight the fact that the circumstances attendant to any dismissal must be compelling in nature and cannot merely reflect the court’s sympathy to a defendant’s personal plight or the court’s disagreement with the way in which a District Attorney handles a particular case.
The instant matter is not a case wherein a prosecution is being dismissed just because the defendant has no prior record and comes from a sympathetic background. Admittedly, the court is giving substantial weight to the defendant’s unblemished record in light of the nature of the charges which do not put society at risk in any way. Nor is the court displeased with the plea bargaining negotiations. This court was not a party to any such negotiations and in fact is confident that had the District Attorney been made aware of the special circumstances of this defendant, the case would have been justly disposed of.
This court is acutely aware of the import of the jury’s verdict and in no way takes that verdict lightly. I have carefully considered the drastic remedy of dismissal in light of a conviction and am convinced that this case cries out for justice in the form of an outright dismissal.
*869 SERIOUSNESS OF THE CRIME AND EVIDENCE OF defendant’s GUILT
As previously noted, this case involves a school yard fight occurring on March 23, 1992 between adolescents Joanna and Marisol. Josephine stood at the periphery when the fight began. It was never clear from the testimony at what point Josephine actually entered the skirmish. According to the testimony of both Marisol and the defendant, Josephine remained behind her sister and away from the complainant until after the fight began. In fact, the complainant testified that she told the police she was involved in a fight with Joanna. At some point, all parties were on the ground together pulling each other’s hair. A fourth teenager, Irene, a friend of the complaining witness, entered the melee as well. As a result of the fight, Marisol suffered scratches to her face which she claims were caused by both sisters. However, there was no clear indication as to how the injuries were incurred or who actually caused them. Recently, the Court of Appeals in People v Wong (81 NY2d 600) reversed the convictions of two defendants charged with second degree manslaughter since it was unclear which of them was actually responsible for an infant’s death.
The injuries incurred in the instant matter basically amounted to bleeding scratches which were not attended to until 24 hours after the incident. Although the complainant claims she has been “scarred for life” the court observed no scar. Medical records indicated that Marisol’s scratches were cleansed and oral and topical antibiotics were prescribed. Several days later, the medical records indicated that the scratches had healed with only a superficial scar remaining. A doctor who had not treated the complainant was called by the prosecution as an expert witness. He basically explained the medical terminology in the hospital records, but could not testify as to the cause of the scratches or the superficial scar. Basically, the evidence of Josephine’s involvement was de minimis as was the evidence of the injuries themselves.
BACKGROUND OF THE DEFENDANT
While the defendant’s background regarding her learning/ hearing disabilities and lack of prior record have been fully discussed, her 1984 school records described her as a “quiet, sweet, youngster” with no behavioral problems. Throughout *870 her 10 years of schooling, she was placed in special education classes and Josephine finally dropped out of high school after failing 10th grade four times.
Josephine is the mother of a child born by caesarian section just 21 days prior to the incident. She lives at home with her mother, siblings and child. Josephine’s mother believes that her daughter thinks like a seven year old and will not permit her to live independently with the baby. It should also be noted that in addition to Josephine’s mental and hearing disabilities, she is a painfully thin and frail looking individual who contrasted sharply with the robust and healthy physical appearance of the complainant.
Additionally, this case has been pending for approximately 17 months, with no subsequent incident, further arrest or any exhibition of violent tendencies.
SOCIETAL IMPACT UPON DISMISSAL
Surely society will not lose confidence in a system that dismisses a case of a young and limited woman, with no prior record, who entered a fight only after observing her younger sister’s involvement and who may have misperceived the situation due to her disabilities. Even assuming the stigma of conviction were to stand, in this case a jail sentence would be completely unwarranted.
Surely the community will not benefit from convicting this individual, when her younger sister, upon similar evidence, has been acquitted and where it is unclear how the injuries occurred and who caused them. Nor are the injuries themselves so heinous that on balance, society’s cry for redress must be answered.
This case is similar in nature to People v Doe (NYLJ, Jan. 7, 1992, at 25, cols 5, 6 [Crim Ct, Bronx County]) whereby in granting the dismissal in the interest of justice, Judge Alessandro commented, "[g]iven the plethora of serious crimes involving drugs and extreme violence including a record setting level of homicides * * * courts ought not to devote substantial criminal justice resources to the prosecution of a punch in the nose of a person frequenting a rowdy bar.”
The public’s confidence will be enhanced in a system that upon realizing it did not work well in this case, refuses to *871 compound the error by expending additional resources on a retrial. The community will be best served by bringing this case to a final and just end. (See, People v Easterling, NYLJ, July 6, 1993, at 33, col 5 [Sup Ct, Kings County, Douglass, J.)
The motion to dismiss in the interest of justice is granted.

. Last names are not being used with respect to any of the parties to this proceeding in order to protect their privacy.

. The extent of defendant’s disability was not known to the court or the Assistant District Attorney until after trial.

. The Trial Judge is authorized to entertain, at anytime before sentence, a motion to dismiss in the interest of justice. (People v Weaver, 112 AD2d 782 [4th Dept 1985].)

. The school director testified on behalf of Joanna as to her good character within the school and explained that she tried to resolve the matter internally to no avail.

. The court was informed that certain sign language interpreters are *866 also qualified oral interpreters who can assist hearing impaired individuals in reading lips.

. All reports, evaluations, test results and interpretations have been made part of the record and received by the parties. Neither party has moved to controvert the findings or evaluations nor have any hearings been requested.